**UNITED STATES of America, Plaintiff-Appellant,**

v.

**DeSOTO PARISH SCHOOL BOARD et al., Defendants-Appellees.**

**No. 76–3471.**

United States Court of Appeals, Fifth Circuit.

June 2, 1978.

Rehearing Denied Aug. 2, 1978.

J. Stanley Pottinger, Asst. Atty. Gen., Daniel L. Jennings, Atty., Brian K. Landsberg, Mark L. Gross, Attys., App. Sect., Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., Donald E. Walter, U. S. Atty., Shreveport, La., for plaintiff-appellant.

A. Mills McCawley, Asst. Atty. Gen., Shreveport, La., John F. Ward, Jr., Baton Rouge, La., James L. Davis, Dist. Atty., Many, La., Thomas W. McFerrin, Asst. Atty. Gen., Baton Rouge, La., for defendants-appellees.

Before BROWN, Chief Judge, MORGAN and GEE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this appeal, we must determine whether the United States is entitled to the addi-

tional remedial measures it seeks in this school desegregation suit. Litigation began in January, 1967, when the United States filed a complaint under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6, to desegregate the public schools in DeSoto Parish, Louisiana. The District Court approved a desegregation plan in 1970. In 1975, the United States filed a motion for further relief, alleging that the plan had failed to eliminate the dual school system and asking the District Court to order and implement comprehensive modifications. Specifically, the Government claimed that the defendants had failed to eradicate racially identifiable schools, failed to comply with the faculty assignment requirements established for this Circuit in *Singleton v. Jackson Municipal Separate School District,* 5 Cir., 1969, 419 F.2d 1211 (en banc), and continued to operate a segregated student bus system. After an evidentiary hearing, the District Court found that four of the parish's eleven schools were attended by only black students and that the racial balance of teachers required by *Singleton* had not been achieved. The District Court Judge nonetheless denied the Government's request for broad relief, ordering only that the defendant school board reexamine and modify the student transportation system. The Judge did not order any changes concerning other methods of student assignment and refused to require additional measures to integrate the faculty. The Government appeals from this limited grant of relief.

We affirm the District Court's finding that the 1970 desegregation plan has not cured the constitutional violation established over a decade ago and the conclusion that further relief is required. Given this finding and conclusion, and absent any sufficient finding that no effective, workable alternative to the 1970 plan can feasibly be implemented, we hold that the District Court erred in refusing to order additional remedial measures to correct the extreme racial imbalances that continue to exist in the DeSoto Parish schools. We therefore reverse and remand.[1]

*I.*

*The DeSoto Parish School System*

DeSoto is a rural parish located near the border between Louisiana and Texas.[2] In 1967, when the United States began this suit, the school system consisted of eight all-white and seven all-black schools.[3] In 1976, when the District Court ruled on the Government's motion for further relief, the school board operated eleven schools.[4] Five of these schools—All Saints High School (grades K–12), DeSoto High School (grades 7–12), Second Ward High School (grades K–12), Logansport-Rosenwald High School (grades K–12), and Johnson Elementary School (grades K–6)—were originally built for blacks.[5] The District Court Judge found that, in the 1975–76 school year, four of these schools were still attended by only black students, and the fifth had a student

---

1. 'As is our practice in school cases, we held a conference attended by a member of the Court, counsel for the parties, and, in this case, the superintendent of schools. In drafting this opinion, we have relied on the conference proceedings to focus the issues in contention and the facts on which the parties agree.

2. Indeed, for years students from Logan, Galloway, and Sabine, Texas, small communities just across the border, have taken buses to attend Logansport High School in DeSoto Parish.

3. Until 1957, state law required that the Louisiana public schools be operated on a segregated basis. La.Const. Art. 12, § 1 (1932); LSA–R.S.

17:331–334, derived from Acts 1954 No. 555, §§ 1–4 (repealed 1957). Until 1971, no white student in DeSoto Parish attended any school originally designated for blacks; during the 1969–70 school year, only 36 black students (out of 3,720 enrolled in the parish) used a freedom of choice option to attend schools originally built for whites. *Hall v. St. Helena Parish Sch. Bd.,* 5 Cir., 1969, 417 F.2d 801, 814.

4. Four schools, two traditionally black and two traditionally white, have been closed since this litigation began. See note 24, *infra.*

5. Kindergarten was added to each school that taught elementary grade students in the 1973–74 school year.

population that was 97 percent black.[6] The schools originally built to serve white pupils exclusively—Mansfield High School (grades 8–12), Stanley High School (grades K–12), Pelican High School (grades K–12), Stonewall High School (grades K–12), Logansport High School (grades K–12), and Mansfield Elementary School (grades K–7)—had student bodies ranging from approximately 67 percent to 85 percent white. In 1975–76, the parish schools were attended by a total of 5,880 students, of whom 60 percent were black and 40 percent white, a ratio that has remained constant since this case began.[7]

As the District Court's 1970 order points out, there is little concentrated residential segregation in the parish; the black population is scattered throughout the area. Since all the schools were built under the dual system, they are located so that each area of the parish is served by at least one traditionally white school and one traditionally black school. As a result, several of the all-black schools are located in close proximity to schools that remain predominantly white.[8]

During the 1975–76 term, 324 faculty members taught at the DeSoto public schools. The systemwide ratio of black to white teachers was fifty-fifty. The segregated condition of the schools extended to the faculty as well as the students; until 1968, no white teachers were assigned to traditionally black schools, and no black teacher taught at a school built for white students. In 1976, after five school years of operation under a desegregation decree, the faculties of the traditionally black schools ranged from 59 percent to 79 percent black, while the faculties of the six traditionally white schools ranged from 81 percent to 71 percent white.[9]

### The 1970 Desegregation Plan

In 1970, after protracted litigation,[10] the school board was ordered to comply with a

6. In 1975, this fifth school, All Saints, was paired with Pelican High School, originally built for white students, to compensate for declining enrollments in both schools. As of January, 1977, All Saints-Pelican High School (grades 7–12) had a student population that was 82 percent black. At the same time, Pelican and All Saints Elementary schools were paired, resulting in a student body that was 85 percent black.

7. Enrollment figures by race and school since 1970 are charted in Appendix A, *supra*.

8. For example, Logansport High School (93 percent white) and Logansport-Rosenwald High School (100 percent black) are 1.2 miles apart; Mansfield Elementary School (74 percent white), Mansfield High School (72 percent white), Johnson Elementary School (100 percent black), and DeSoto High School (100 percent black) are approximately 1.5 miles from each other. Pelican High School (54 percent white) is 0.9 miles from All Saints High School (100 percent black); these schools have been paired since this case was decided.

9. Faculty distribution by race and school since 1970 is charted in Appendix B, *supra*.

10. The progress of this litigation mirrors the progress of the law of school desegregation. Both can be traced through the repeated journeys the suit has made to this Circuit. The District Court's 1967 injunction followed the decision of this Court in *United States v. Jefferson County Bd. of Educ.*, 5 Cir., 1967, 380 F.2d 385, 389 (en banc), *cert. denied*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103, holding that school boards "have the affirmative duty . . . to bring about an integrated, unitary school system in which there are no Negro schools and no white schools—just schools." The District Court on remand approved a freedom of choice option, *Conley v. Lake Charles Sch. Bd.*, 1968, W.D.La., 293 F.Supp. 84; the Fifth Circuit ordered that this be reexamined in *Adams v. Mathews*, 5 Cir., 1968, 403 F.2d 181. The District Court's reaffirmation of freedom of choice was reversed in *Hall v. St. Helena Parish Sch. Bd.*, 5 Cir., 1969, 417 F.2d 801, *cert. denied*, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180, and the case remanded for reconsideration in light of the duty articulated in *Green v. County Sch. Bd. of New Kent County*, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, to "come forward with a plan that promises realistically to work . . . now." The District Court then approved a plan formulated by the school board that was to be implemented over a three-year period; in *United States v. DeSoto Parish Sch. Bd.*, 5 Cir., 1970, 420 F.2d 380, this Court held the plan inadequate in light of *Singleton v. Jackson Municipal Separate Sch. Dist.*, 5 Cir., 1969, 419 F.2d 1211, 1217–18, (faculty and staff desegregation to be accomplished effective February 1, 1970). *Singleton* allowed the desegregation of students in several school districts to be deferred beyond February 1, 1970. This portion of the decision was reversed by the Supreme Court in *Carter v. West Feliciana Parish Sch. Bd.*, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477. The Fifth Circuit ordered the school board to prepare for complete desegregation by February 1, 1970, "in the event"

desegregation decree based on a plan it submitted to the District Court.[11] This plan assigned students to schools under one of three alternative arrangements. Students living within attendance zones established by the plan had to attend a designated school, subject to a majority-to-minority transfer proviso.[12] Students who did not live within a zoned area attended school according to the destination of the bus they rode. Finally, any student who did not live in a zoned area and provided his own transportation could attend the school of his or her choice.[13]

### Attendance Zones

The 1970 plan established four zones within the parish. At the 1976 hearing, the United States presented evidence showing that the zones are noncontiguous, that in several instances the zones are drawn around racially homogenous residential areas [14] and assign the children living there to a school originally designated for students of that race, and that frequently children are zoned to schools attended primarily or exclusively by students of their own race when other schools are located closer to their homes. The pattern of the zones is consistent with this evidence.

The city of Mansfield constitutes one zone, and contains three subzoned areas: one surrounds an all-black residential area and assigns children living there to Johnson Elementary School and DeSoto High School, which are completely black; the second assigns students to DeSoto High School from an all-black residential area; the third zone covers the remainder of the city, and assigns students to the predominantly white Mansfield High School and Mansfield Elementary School. At the hearing, school officials admitted that many of the white students zoned to Mansfield Elementary live closer to Johnson Elementary, and those zoned to Mansfield High School live closer to DeSoto High School [Tr. at 33–35.]

The second zone comprises the city of Logansport, located in the west and southwest portion of the parish. The plan drew boundaries for one subzone within Logansport around the only black residential part of the area and assigned students to the principally black Logansport-Rosenwald High School. The remainder of the city was zoned to the traditionally white Logansport High School. The third zone in the parish encompasses the Stanley area, also located in the southwestern region.

---

the Supreme Court did reverse that aspect of *Singleton*. On remand after *Carter* was decided, the District Court readopted the plan approved in 1969, modifying it to incorporate *Singleton* and to require implementation effective February 1, 1970.

The United States did not appeal from the District Court's 1970 order approving the desegregation plan.

**11.** The 1970 plan incorporated a requirement that the school board make annual reports to the District Court. Such a requirement has long been the practice in school cases. *E. g., United States v. Jefferson County Bd. of Educ.,* 5 Cir., 1967, 380 F.2d 385, 395 (en banc). A more detailed set of reporting requirements was ordered in December, 1970, on motion by the Government. We have used these reports in reviewing the District Court's findings and in understanding current conditions.

**12.** No attendance zones existed prior to the 1970 desegregation plan. Students were as-

signed to school by race and by bus routes: each student would board the bus that both passed closest to his home and that carried students of his own race, and would attend the school to which the bus was routed.

**13.** The 1970 plan provided for assignment by zones, transportation, and majority-to-minority transfer. The option permitting students living outside zoned areas to attend the school of their choice if they provided their own transportation was based on the school board's interpretation of the Court order to mean that "if a child rode the bus . . . he must go to the school to which the bus transported him. If he did not get on the bus, then he was not covered under . . . the Court order, and he may enroll at the school to which he requested enrollment." [Deposition of Superintendent of Schools Douglas McLaren, at 103.]

**14.** Although there is no monolithic concentration of blacks in any single area, there are pockets of racially homogenous neighborhoods scattered throughout the parish.

The students living within this zone, most of whom are white, are assigned to the traditionally white Stanley High School. The fourth zone covers the Stonewall-Second Ward area in the northern section of the parish. The zone is divided into two parts: the first encompasses a principally white residential area and assigns students living within it to the traditionally white Stonewall High School, and the second surrounds a largely black residential area and directs students within it to the wholly black Second Ward High School.

To assess the Government's contention that the zones must be altered in any constitutionally sufficient plan, the other methods of student assignment included in the 1970 plan must also be examined.

### Bus Routes

As in many rural school districts, a large portion of the students attending public school in DeSoto Parish ride school buses.[15] The 1970 plan provided that students living outside a zoned area who did not furnish their own transportation would be assigned to a school by virtue of the bus they rode. This provision contained two further limitations: no black student was to be transported "past" a formerly all-white school, and no white student was to be transported "past" a formerly black school; and no student would be permitted to use a bus stop other than the one closest to his home in order to avoid riding a particular bus.

The school board projected that under this plan 352 white students would ride buses routed to formerly black schools. In

1974–75, the school board's reports revealed that 129 white students should be on buses routed to formerly black schools. No white student actually rode such buses; none attended a formerly black school. Of the 2,544 black students who used the buses in the 1975–76 term, only 449 (or 17 percent) rode to formerly white schools. Based on such figures and the testimony of bus drivers and school officials presented at the 1976 hearing, the District Court found that the school board had maintained the dual bus system that existed prior to the implementation of the 1970 decree.

The dual bus system was characterized by overlapping and circuitous routes. Two buses traveled down the same road or same general area, one picking up white students to take them to a traditionally white school, and one picking up black students to deliver them to a traditionally black school.[16] Although the 1970 plan prohibited routes by which buses would be driven "past" schools attended by children of a race different from those riding the bus, this prohibition was circumvented by a highly literalistic interpretation. Buses were frequently routed circuitously to avoid passing directly in front of schools attended by students of a different race, resulting in unnecessarily long trips that ended at schools originally designated for children of the same race as the bus passengers. [Tr. at 82–95.] In particular, the Government directs our attention to the white students from Logansport and Carthage, Texas who ride buses to the predominantly white Logansport High School, although the all-black Logansport-Rosenwald school is closer.

---

15. In the 1975–76 term, approximately 3,500 students, over 60 percent of the total school population, rode buses to school. Of this group, 2,544 were black, and 1,073 were white. [Tr. at 61.]

16. Students were assigned to a bus route rather than a particular bus. School officials testified that if two buses come by one stop, a child could choose which bus to ride. [Tr. at 40; Deposition of Transportation Supervisor Raymond Powell, at 13.] In 1975–76, over 90 percent of the black and white students using the

bus system rode buses containing only students of one race. Of the 449 black students who traveled by bus to formerly white schools, 409 (91 percent) rode on buses carrying only black students. [Government Exhibit 7.]

In addition to segregation according to student passengers, the record reveals substantial segregation of bus drivers. Seventy-three bus drivers were employed in the 1975–76 school year; the forty-four drivers who were black carried no white children on their buses. [Government Exhibit 7.]

### Faculty Assignments

The 1970 desegregation decree incorporated the requirements of *Singleton v. Jackson Municipal Separate School District*, 5 Cir., 1969, 419 F.2d 1211, 1217–18, that the faculty of each school must reflect the systemwide racial ratio of faculty members and that faculty members must accept reassignment as a condition of continued employment. At the 1976 hearing, school board officials admitted that neither requirement had been met, and the District Court found that the "five schools which were originally constructed to serve only black students continue to have a substantially higher percentage of black faculty then the schools which were designed to serve white students, although the ratio of black to white teachers . . . is approximately 50 percent," and that no formerly white school had a "black faculty percentage greater than 31 percent."

### The District Court's Ruling On The Motion For Further Relief

Against this background of largely undisputed facts, the District Court found that "[a]lthough the schools constructed for blacks have remained all or practically all black even after the desegregation order, it is unclear whether this situation results from the student attendance zones or from the transportation system. . . . [T]his Court is inclined to believe that the transportation system has been the primary contributor to the one-race schools." Stating that the "School Board has failed to dismantle the dual system of student transportation and has failed to comply with the spirit of the . . . 1970 order," the trial judge ordered the parties to reexamine the bus system and submit plans for the elimination of overlapping, circuitous, and segregated routes. The Court denied the Government's requested relief from the continued operation of the attendance zones and the freedom of choice option. This denial is implicitly premised on a finding that these aspects of the 1970 plan had not "resulted in" or "primarily contribute[d]" to the continued segregation of the schools.

The District Court agreed with the United States in finding that ". . . the School Board has failed to achieve the racial balance of teachers called for in *Singleton*." However, the District Court declined to order strict compliance with the *Singleton* requirements. The Judge cited two reasons for this decision: the gradual, yet steady, improvement in the racial balance of the faculties achieved in most schools since 1970, and his disinclination to order "strict mathematical ratios" in either student or faculty assignments. Expressing a hope for more rapid improvement in the future, the District Court essentially modified the terms of the 1970 decree by declining to enforce the *Singleton* requirements it incorporated.

Finding errors of both fact and law, we reverse.

### II.

When a school system is found to be in violation of the Constitution, the duty of the responsible state officials is clear and compelling: "to take the necessary steps 'to eliminate from the public schools all vestiges of state-imposed segregation.'" *Milliken v. Bradley*, 1977, 433 U.S. 267, 290, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745, 762, *quoting Swann v. Charlotte-Mecklenburg Board of Education*, 1971, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554, 566. If the school board defaults in its duty, the responsibility of the District Court is equally clear and compelling: to use its broad and flexible equitable powers to implement a remedy that, while sensitive to the burdens that can result from a decree and the practical limitations involved, promises "realistically to work *now*." *Green v. County Sch. Bd. of New Kent County*, 1968, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716; *Swann, supra*.

### Student Assignments

The plan formulated by the school board and adopted by the District Court in 1970 was expected to result in student populations in the formerly black schools ranging from 76 percent to 98.5 percent black,

and student bodies at the formerly white schools ranging from 54 percent to 90 percent white.[17] The statistics for actual enrollment show that the results never approached these expectations, modest though they were. In 1975–76, four of the five black schools remained 100 percent black; the formerly white schools remained 67 to 85 percent white.[18] The school board's most recent report to the District Court reveals that in 1977–78, the same four schools are still attended only by black students. "Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory . . . [and] that [the schools'] racial composition is not the result of present or past discriminatory action on their part." *Swann v.*

*Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. at 26, 91 S.Ct. at 1281, 28 L.Ed.2d at 572. As the District Court found, the school board is unable to meet this burden. The question on appeal is whether the 1970 plan, as modified by the District Court's 1976 order, offers any significant promise of eliminating the one-race schools that pervade the parish.

■■ The District Court found that the racial composition of the schools was "primarily" due to the school board's unconstitutional retention of the discriminatory dual bus system. So finding, and implicitly finding that other aspects of the 1970 plan challenged by the Government—particularly the attendance zones and the free choice option—did not cause the continued segregation, the Court ordered revisions in the bus routes but refused to require more radical modifications in the 1970 plan. We hold

17. In submitting its desegregation plan to the District Court in 1970, the school board supplied the following figures as projections for expected enrollment as of February 1, 1970:

### Former Black Schools

| | Zoned | | Transported | | Total | | Percent | |
|---|---|---|---|---|---|---|---|---|
| | B | W | B | W | B | W | B | W |
| DeSoto | 344 | 3 | 376 | 101 | 720 | 104 | 87 | 13 |
| Johnson | 421 | 2 | 295 | 80 | 716 | 82 | 90 | 10 |
| Longstreet-Rosenwald | 0 | 0 | 122 | 14 | 122 | 14 | 89.7 | 10.3 |
| Logansport-Rosenwald | 75 | 0 | 288 | 114 | 363 | 114 | 76.1 | 23.9 |
| All Saints | 0 | 0 | 382 | 33 | 382 | 33 | 92 | 8 |
| Second Ward | 164 | 2 | 647 | 10 | 811 | 12 | 98.5 | 1.5 |

### Former White Schools

| | B | W | B | W | B | W | B | W |
|---|---|---|---|---|---|---|---|---|
| Mansfield Elem. | 87 | 419 | 213 | 200 | 300 | 619 | 32.6 | 67.4 |
| Mansfield H. S. | 58 | 279 | 73 | 65 | 131 | 344 | 27.6 | 72.4 |
| Logansport | 54 | 192 | 0 | 296 | 54 | 488 | 10 | 90 |
| Stanley | 56 | 173 | 0 | 72 | 56 | 245 | 18.6 | 81.4 |
| Pelican | 0 | 0 | 132 | 155 | 132 | 155 | 46 | 54 |
| Stonewall | 16 | 98 | 72 | 136 | 88 | 234 | 27.3 | 72.7 |

18. The actual enrollment figures for each year in which this school desegregation plan operated are attached as Appendix A.

that this finding is clearly erroneous. The record is replete with evidence that several aspects of the 1970 plan, in addition to the segregated bus system, resulted in the continuing and extreme racial imbalance in the schools. There is no finding that merely modifying the bus routes is likely to succeed in altering the racial composition of the schools. We do not believe such a finding can be made. The bus routes were altered pursuant to the 1976 order. The racial distribution of the schools showed almost no change as a result, failing even to realize the very modest projections cast by the school board.[19] Until the 1970 plan is significantly modified, we see no possibility that this school system will ever rid itself of the vestiges of state-imposed segregation.[20]

19. In submitting its revised transportation plan to the District Court in 1976, the school board projected that 276 white students would attend the four all-black schools, resulting in student populations at the schools ranging from 87.7 to 90 percent black. The attendance figures for the 1976–77 and 1977–78 terms show that none of these white students have enrolled; the schools remain 100 percent black.

20. We find the state of this school system similar to the system before this Court in *Lee v. Demopolis City School System,* 5 Cir., 1977, 557 F.2d 1053, where we held that the procedures set forth by the Supreme Court last term in *Dayton Board of Education v. Brinkman,* 1977, 433 U.S. 406, 420, 97 S.Ct 2766, 2775, 53 L.Ed.2d 851, 863, did not govern "so extreme a case" with such "unique statistics." *Brinkman* instructs that:

> The duty of both the District Court and of the Court of Appeals *in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased,* is to first determine whether there was any action in the conduct of the business of the school board which was intended to, and did in fact, discriminate against minority pupils, teachers or staff. *Washington v. Davis, supra* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597]. All parties should be free to introduce such additional testimony and other evidence as the District Court may deem appropriate. If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy. *Keyes [School District No. 1, Denver, Colorado], supra* [413 U.S. 189], at 213 [93 S.Ct. 2686, 37 L.Ed.2d 548].

[Emphasis added.]

In *Lee v. Demopolis,* the Court felt that the one-race composition of the only two elementary schools in a small city justified reversing the lower court's adjudication of unitariness and presuming an intent to discriminate on the part of local authorities. In both DeSoto Parish and Demopolis City, segregation by law has ended, but neither this event nor subsequently required affirmative steps to desegregate have substantially altered the racial balance of the schools. In *Lee,* this factor was sufficient to distinguish *Brinkman,* and we believe it suffices here as well.

Unlike *Lee,* however, we need not rely on a presumed intent to discriminate. The District Court found that the school system remained dual and that the school board had maintained segregated bus routes. Because the District Court found that neither the attendance zones nor the free choice option played a significant role in keeping the school system segregated, it did not consider whether these other aspects of the 1970 plan were intended to discriminate against black students. In reversing the denial of relief from these methods of student assignment, we need not presume that they were devised or retained with an intent to discriminate, nor ask the District Court to make findings on whether such an intent is present. Our mandate for further relief is based on the District Court's clear finding of a systemwide violation. We are not limited to correcting only those specific actions that have been found intentionally discriminatory. Nor are we required to send the case back to the District Court for findings of fact that, considering the lack of any change in the racial distribution of the schools, seem to us to be obvious. "[W]here, as here, a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the '*condition* that offends the Constitution.'" *Milliken v. Bradley,* 1977, 433 U.S. 267, 282, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745, 757 [*Milliken II*], quoting *Milliken v. Bradley,* 1974, 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069, 1087 [*Milliken I*]. The condition that offends the Constitution is the de jure segregation in the schools. The remedial measures that must be ordered are those necessary "to restore the victims of discriminatory conduct to the position they would have enjoyed . . . in a school system free from pervasive *de jure* racial segregation." *Milliken II,* 433 U.S. at 282, 97 S.Ct. at 2758, 53 L.Ed.2d at 757.

The attendance zones clearly affect the racial composition of the schools. The 1970 projections show that assignment on the basis of residence within an attendance zone would account for a substantial proportion of the students expected to enroll in the various schools.[21] Because fewer students than projected rode the buses, zoning assignments accounted for a higher percentage of students than the projections reveal.[22] Virtually no white students are zoned to attend formerly black schools, a result achieved by the congruence of zone boundaries with racially homogenous neighborhoods and schools.[23]

The "free choice" option available to students who do not live in a zoned area and who can provide their own transportation has, if anything, a greater effect on the racial composition of the schools than the zones. Because almost all of the white students live outside zoned areas, they are essentially free to attend the school of their choice. Evidence at the 1976 hearing indicated that this arrangement, particularly in combination with the overlapping bus routes, allowed white students in the parish "a number of options . . . to avoid attendance at a black school, . . . without attending a private school." [Tr. at 29, 118.] That these options were used is clear: from 1970–76, only 13 white students attended formerly black schools.[24]

As long as the attendance zone boundaries are retained as drawn and the free

---

21. These projections show that assignment on the basis of residence within an attendance zone would account for approximately half the students expected to enroll in the four Mansfield schools, three-fourths of the students projected to attend the Stanley school, one-third of the students assigned to Stonewall High School, 16 percent of the students projected to enroll at Logansport-Rosenwald, and 20 percent of the students assigned to Second Ward High School. See note 17, *infra*.

22. At Logansport-Rosenwald, for example, black students assigned by zoning constituted 16 percent of the total projected to enroll at the school. However, none of the 114 white students "assigned" to the school by bus route ever attended. At DeSoto High School, zoning assigned 47 percent (344 black and 3 white students) of the total number of students projected to enroll in 1970. However, in 1970–71, none of the 104 white students assigned by bus route attended, resulting in a total enrollment of 665 black students, more than 47 percent of whom live within the area zoned to the school. And at Johnson Elementary, 53 percent (421 black and 2 white students) of the projected student body were assigned by attendance zone. None of the 82 white students projected to enroll at the school ever attended, resulting in a total enrollment of 828 black students.

23. The superintendent of schools, Douglas McLaren, testified that the zone lines were drawn to move away from the "freedom of choice concept" in favor of a "neighborhood school approach." McLaren deposition, at 59. While a policy designed to achieve neighborhood schools has well-recognized benefits for the students, see *United States v. Jefferson County Bd. of Educ.*, 5 Cir., 1966, 372 F.2d 836, aff'd en banc, 1967, 380 F.2d 385, cert. denied, 389 U.S. 849, 88 S.Ct. 67, 19 L.Ed.2d 103, we do not believe that such a policy explains these zone boundaries. The zone lines deviate from "neighborhood" lines to follow racial lines; many children live closer to a school than the one they are assigned to attend under the zone system. We have long recognized that where "some white students are attending schools located greater distances from their home than nearby schools where the student body is all Negro," a neighborhood school system does not exist. *Ellis v. Board of Public Instruction*, 5 Cir., 1970, 423 F.2d 203, 206–207 (*Ellis I*). The superintendent admitted that the neighborhood school concept as a basis for drawing the zone lines was tempered by another consideration: to keep white students from fleeing the system. [McLaren deposition at 77.]

24. The Government urges that an additional factor causing the continuing segregated condition of the schools is the reassignment of students from four schools that have closed since this litigation began. Grand Cane High School, originally built for whites, closed in 1967; Longstreet High School, also designated for whites, closed in 1969. Students from Grand Cane were assigned to attend Mansfield High School, Mansfield Elementary School, or Stonewall High School, all originally intended for white students. Students from Longstreet High School were given a freedom of choice option. The other two schools closed during this suit were originally designated for black students: Longstreet-Rosenwald High School closed in 1970, and Grand Cane Community High School closed in 1971. Students from Longstreet-Rosenwald were reassigned to two schools attended exclusively by black students, while students from Grand Cane Community

choice option remains, eliminating the overlapping and circuitous bus routes will not end the segregated condition of this school system. With the free choice option, the school board continues to provide white students with an easy alternative to attending a formerly black school while remaining in the public school system. The history of desegregation efforts in this parish shows that white students have consistently failed to attend traditionally black schools, while black students are zoned to such schools in significant numbers.

The school board does not deny that the zones are gerrymandered around racially homogenous neighborhoods, or that the overlapping bus routes and the free choice option have afforded white children an easy alternative to attending the black schools to which they were "assigned." Rather, the board makes a series of arguments to justify the minimal degree of desegregation attained under the 1970 plan. For the reasons stated below, none of these arguments are sufficient to excuse the board from taking additional affirmative steps to desegregate this school system.

The board's first argument is that even if the 1970 plan, as modified by the District Court's 1976 order, does not eliminate any or all of the one-race schools, this school system could still achieve unitary status. The board directs our attention to several recent opinions of this Court declaring school systems unitary despite the continuing existence of several racially identifiable schools. These decisions cannot aid DeSoto Parish. "We do not here contemplate a system including two or three essentially one-race schools resulting from geographic or demographic accidents and surviving as minor anomalies in a broadly integrated program, despite earnest planning and honest effort to eliminate them and those like them, because practical considerations of hazard, distance or expense all but forbid their elimination." *Lee v. Demopolis City School System,* 5 Cir., 557 F.2d 1053, 1054; *see also, United States v. Seminole County Sch. Dist.,* 5 Cir., 1977, 553 F.2d 992; *Ellis v. Board of Public Instruction,* 5 Cir., 1972, 465 F.2d 878, *cert. denied,* 1973, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (*Ellis II*).

No physical barriers, insuperable distances, or demographic obstacles prevent the assignment of students in ways that would alleviate the segregation still present in the DeSoto Parish schools. We do not believe that the board has shown that the present situation represents the maximum desegregation practically achievable. *United States v. Seminole County Sch. Dist. supra,* 553 F.2d at 995. These factors distinguish the situations in which this Court approved plans that retained one-race schools. For example, in *Stout v. Jefferson County Bd. of Educ.,* 5 Cir., 1976, 537 F.2d 800, we approved a plan that left three elementary schools racially homogenous on findings that this resulted from "geography and demography alone," and that the schools served only a relatively small number of students in a system that provided all students with desegregated high schools; in *Carr v. Montgomery County Bd. of Educ.,* 1974, M.D.Ala., 377 F.Supp. 1123, 1132, *aff'd,* 5 Cir., 511 F.2d 1374, *cert. denied,* 1975, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303, we approved the retention of a small number of predominantly black elementary schools on findings that residential patterns, not discrimination, caused the racial imbalance, that no alternative could effectively achieve desegregation, and that every student would attend a completely integrated high school.

In DeSoto, by contrast, over 83 percent of the black pupils attend all-black schools, and, under the current plan, will never be exposed to a desegregated school. There is

---

were reassigned to Mansfield High School and Mansfield Elementary School, both schools originally intended for whites.

The record thus reveals that no white student who attended one of the closed schools was reassigned to a black school or went to such a school under a freedom of choice option. [Tr. at 16–18; McLaren deposition, at 108–114.]

no entrenched residential segregation, and several of the all-black schools are located in close proximity to schools originally designated for whites. Such factors indicate, and the Government urges, that an alternative plan would be relatively easy to implement. "In the conversion from dual school systems based on race to unitary school systems, the continued existence of all-black or virtually all-black schools is unacceptable where reasonable alternatives exist." *Boykins v. Fairfield Bd. of Educ.,* 5 Cir., 1972, 457 F.2d 1091, 1095, *quoted* in *Lemon v. Bossier Parish School Board,* 5 Cir., 1978, 566 F.2d 985, 987.

The board's response is to repeat the refrain it has sung since 1968: any alternative measures that promise to increase the amount of desegregation will lead to white flight and the "resegregation" of the schools. This argument must fail. It is the law in the Supreme Court and in this Circuit that white flight "cannot [be] . . . accepted as a reason for achieving anything less than complete uprooting of the dual public school system." *United States v. Scotland Neck City Bd. of Educ.,* 1972, 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75; *Lee v. Macon County Bd. of Educ.,* 5 Cir., 1972, 465 F.2d 369.[25]

■ This is not to say that a school board or Court must ignore a likely danger of an exodus of white students from a school system. "[I]n choosing between various *permissible* plans a chancellor may . . elect one calculated to minimize white boycotts. . . . He may not refuse to adopt a permissible plan and elect or confect one which preserves a dual system because of such fears." *Stout v. Jefferson County Bd. of Educ.,* 1976, 5 Cir., 537 F.2d

800, at 802. The 1970 plan, as modified by the District Court's 1976 order, was devised with the fear of white flight as a paramount consideration. The plan preserves a dual system and cannot be retained over a more successful approach because of this fear.

### Faculty Assignments

■ The Government urges that the District Court erred in declining to insist that the school board comply immediately with the *Singleton* requirements that the faculty of each school reflect the systemwide racial ratio of faculty members and that teachers accept reassignment as a condition of continued employment. We agree with the Government. The District Court found that sufficient gradual improvement had taken place since 1970 to make "strict mathematical ratios" unnecessary and left the school board to continue as before, with the hope for more rapid improvement in the future. This approach, particularly in a school system marked by the consistent failure of mild measures, ignores the fact that *Singleton* is a command based on the Constitution, not an optional set of guidelines. We have long since rejected as ineffective the standard apparently adopted by the District Court, that desegregation progress with "all deliberate speed." *Alexander v. Holmes County Bd. of Educ.,* 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (per curiam).

The District Court's factual premise for its denial of further relief as to the faculty is also open to question. The statistics and testimony as to the present situation do not support an expectation of more rapid improvement in the future or the swift attainment of a unitary faculty. While there has been some improvement in faculty integration, the pace is slow and the degree

---

**25.** The reason for this rule reveals the importance of enforcing it rigorously. "White flight is an expression of opposition by individuals in the community to desegregation of the school system. . . . From the inception of school desegregation litigation, accommodation of op-

position to desegregation by failing to implement a constitutionally necessary plan has been impermissible." *Morgan v. Kerrigan,* 1 Cir., 1976, 530 F.2d 401, 420, *cert. denied,* 1977, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386.

slight.[26]  In the 1975–76 school term, 70 percent of the white faculty taught in traditionally white schools, and 76 percent of the black teachers were assigned to traditionally black schools.  Recent reports submitted by the school board reveal no substantial improvement.[27]  In addition to the school board's admitted failure to condition employment on teachers' willingness to accept reassignment, and failure to initiate reassignments, the record contains evidence that when reassignment was required by the closing of schools, most of the white teachers ·were reassigned to traditionally white schools and the blacks to schools designated for black students.[28]  The record also indicates that new teachers have not been assigned in ways that would increase desegregation; between the 1969–70 and 1975–76 school terms, 57 percent of the newly hired white teachers were assigned to formerly white schools, and 92 percent of the newly hired black teachers were assigned to traditionally black schools.[29]

■  The school board urges that if they are required to implement the *Singleton* requirements without delay, a form of white flight among the faculty will result.  Pointing to the difficulties DeSoto Parish faces in competing with nearby, wealthier school systems in attracting and keeping qualified teachers, the board asserts that measures such as reassignment to achieve compliance with *Singleton* will lead to large numbers of faculty resignations.  The fear of faculty resistance to desegregation measures, like the fear of community resistance, cannot be allowed to defeat an effective desegregation plan in favor of a plan that is unlikely to achieve a unitary system.

### III.

### Remedy

■  The 1970 plan, with the 1976 order revising the bus routes, has failed to desegregate this school system, failed even to

**26.**  In 1970–71, and in 1975–76, the following  faculty distribution existed:

|  | 1970–71 | | | 1975–76 | | |
|---|---|---|---|---|---|---|
| | | Former Black Schools | | | | |
| | B | W | %B | B | W | %B |
| All Saints | 16 | 2 | 89 | 13 | 5 | 72 |
| DeSoto | 28.5 | 6 | 83 | 27 | 10 | 73 |
| Johnson | 26.5 | 3 | 90 · | 30 | 11 | 73 |
| Logansport-Rosenwald | 15 | 7 | 68 | 17 | 12 | 59 |
| Second Ward | 37 | 3 | 93 | 33 | 9 | 79 |
| | | Former White Schools | | | | |
| | B | W | %B | B | W | %B |
| Logansport | 8 | 21 | 28 | 8 | 23 | 26 |
| Mansfield Elem. | 8 | 21.5 | 27 | 9 | 24 | 27 |
| Mansfield H. S. | 6 | 18.5 | 24 | 6 | 22 | 21 |
| Pelican | 6 | 10 | 38 | 4 | 13 | 24 |
| Stanley | 5 | 10 | 33 | 5 | 11 | 31 |
| Stonewall | 5 | 10 | 33 | 6 · | 17 | 26 |

**27.**  The figures for faculty distribution in the 1976–77 and 1977–78 school terms are included in Appendix B.

**28.**  Tr. at 108–113.

**29.**  McLaren deposition at 154–56.

achieve the modest projected results, and is therefore constitutionally inadequate. The District Court must order further relief. We now turn to the question of an appropriate remedy. The Government's uncontradicted assertion is that several alternatives could easily be implemented to begin disestablishing the one-race schools. The board's major objection to the Government's proposals, the fear of white flight, is not sufficient to justify a refusal to make such an attempt. On remand, the parties and the Court are directed to devise and implement a comprehensive plan that, by whatever reasonable means the District Court deems appropriate, will end the segregated condition of this school system. *Cisneros v. Corpus Christi Indep. Sch. Dist.,* 5 Cir., 1972, 467 F.2d 142, 152–53 (en banc), *cert. denied,* 1973, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044. In formulating such a plan, the District Court's equitable powers are sufficiently flexible to shape its decrees in a fashion that will minimize dislocations and burdens on the educational process. *Milliken v. Bradley, supra,* 433 U.S. at 280 n. 15, 97 S.Ct. at 2757, 53 L.Ed.2d at 756.

While we cannot and do not wish to require any specific plan, there are several steps that must be taken to satisfy the constitutional requirements for desegregation.

### Student Assignments

■ First, the attendance zones cannot remain as presently drawn. Geographic zones used as a method of student assignment cannot be retained where they impede the desegregation process; indeed, a desegregation plan incorporating attendance zones is insufficient unless the boundaries are drawn to achieve the "greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis v. Board of School Commissioners,* 1971, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577, 581; *Swann v. Board of Educ., supra,* 402 U.S. at 28–29, 91 S.Ct. 1267, 28 L.Ed.2d at 573–74; *Ellis v. Board of Public*

*Instruction,* 5 Cir., 1972, 465 F.2d 878, *cert. denied,* 1973, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (*Ellis II*); *Henry v. Clarksdale Municipal Separate Sch. Dist.,* 5 Cir., 1969, 409 F.2d 682, *cert. denied,* 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242. The zones should be redesigned to discharge this affirmative duty. "The process of desegregation . . . is often one of trial and error; if one set of zones proves ineffective, then another must be drawn and, if necessary, another, or some yet different approach be tried." *United States v. Hinds County Sch. Bd.,* 5 Cir., 1977, 560 F.2d 1188, 1191.

■ Second, we believe that the provision by which all students living outside zoned areas who can furnish their own transportation are allowed to attend the school of their choice must be eliminated. We agree with the Government's argument that such a provision is similar to the "free-transfer" practice invalidated in *Monroe v. Board of Commissioners,* 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733, and to the free choice policy held unacceptable in *Green v. County Sch. Bd., supra,* 391 U.S. 430, at 439–41, 88 S.Ct. 1689, at 1694–96, 20 L.Ed.2d 716, at 724–26. Like a free transfer or free choice provision, the option allows DeSoto students to avoid attending the schools to which they are assigned according to the bus routes; it is an "implicit invitation [to return] . . . to the comfortable security of the old, established discriminatory pattern." *Monroe, supra,* 391 U.S. at 459, 88 S.Ct. at 1705, 20 L.Ed.2d at 739. *Green* and *Monroe* state the principle that governs here: "if it cannot be shown that such a [free choice or free transfer option] will further rather than delay conversion to a unitary, nonracial, nondiscriminatory school system, it must be held unacceptable." 391 U.S. at 459, 88 S.Ct. at 1705, 20 L.Ed.2d at 739. No such showing is possible in this case, and the free choice option cannot remain in a constitutionally valid plan.[30]

■ More specific remedial steps must await further factual development by

---

**30.** A freedom of choice plan has on occasion been held sufficient. E. g., *Singleton v. Jack-* *son Municipal Separate School District,* 5 Cir., 1969, 419 F.2d 1211, 1221 (No. 28361, St. John

the District Court.[31] At this stage, we can only conclude that effective methods are available. In some areas of the parish, such as the city of Mansfield, zones that assign children to the schools nearest their homes offer a promise of increased integration. In other areas, where schools traditionally serving separate races are located within one and one-half miles of each other, pairing would appear to be a feasible and effective remedy that would not unduly increase the travel burdens on the students.[32] Although pairing is not required as a remedy of "first resort," "where all-black or virtually all-black schools remain under a zoning plan, but it is practicable to desegregate some or all of the black schools by using the tool of pairing, *the tool must be used.*" *Flax v. Potts,* 5 Cir., 1972, 464 F.2d 865, 868, *cert. denied,* 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299, *quoting Allen v. Board of Public Instruction,* 5 Cir., 1970, 432 F.2d 362, 367, *cert. denied,* 1971, 402 U.S. 952, 91 S.Ct. 1609, 29 L.Ed.2d 123. [Emphasis added].

### Faculty Assignments

We have held erroneous the District Court's refusal to grant further relief from the board's admitted decision not to comply with *Singleton.* While we share the Court's dislike for ordering "strict mathematical ratios," their effectiveness as a starting point in eliminating the vestiges of segregation in both student and faculty assignments is beyond question. Moreover, *Singleton* does not require that such ratios be maintained permanently; rather, it "contemplates an initial reassignment so that the racial ratio at every school reflects the systemwide ratio, followed by the utilization of a non-discriminatory hiring, firing, and assignment policy thereafter." *United States v. Wilcox County Bd. of Educ.,* 5 Cir., 1974, 494 F.2d 575, 580, *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306. In this case, the board never began to comply with these requirements. We remand with instructions that *Singleton* is to be enforced in accordance with its terms, without further delay.

The order of the District Court is reversed insofar as it denied the relief sought. The case is remanded with instructions that the District Court adopt and implement a comprehensive plan to eliminate the one-race schools in DeSoto Parish and bring the system to the unitary status demanded by the Constitution.

### AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Appendix A to follow.

the Baptist Parish, La.). In this case, the Court used such a plan as an alternative to requiring the division of a small number of white students among five schools in one part of a predominantly black school system, a part isolated from the integrated remainder of the system by the Mississippi River, a formidable geographic barrier. This case was later distinguished and a free choice plan disallowed on a basis that applies here as well: "[t]he . . . School Board has yet to demonstrate objectively its will to operate this system in a manner calculated to remedy past discriminatory practices and achieve unitary status. . . . If and when this School Board removes itself from the shadow of contempt, the District Court may then consider whether a racially neutral freedom of choice plan could be of benefit in bringing about a unitary system. . . . That day has not yet arrived." *United States v. Wilcox County Bd. of Educ.,* 5 Cir., 1974, 494 F.2d 575, 580, *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306.

31. The Government urges that even as modified, the bus routes still operate to maintain segregation in the schools, or at least do not affirmatively aid desegregation. On the remand, the District Court should direct the parties to reconsider the bus routes as one part of the comprehensive new desegregation plan required.

As part of this reconsideration, we again draw the school board's attention to the students from Texas who attend school in DeSoto Parish. They must be assigned to schools in a fashion that satisfies not only the requirement of a desegregated bus system, but also the provision of the 1970 decree, common to most desegregation plans, providing that:

If the school district grants transfers to students living in the district for their attendance at public schools outside the district, or if it permits transfers into the district of students who live outside the district, it shall do so on a non-discriminatory basis, except that it shall not consent to transfers where the cumulative effect will reduce desegregation in either district or reinforce the dual school system.

32. See note 8, *infra,* for a description of the schools and the distances between them. We are cognizant of the difficulties presented by the Stonewall and Second Ward High Schools, which are located 12.8 miles apart.

APPENDIX A

DeSoto Parish School System Student Enrollment By Race
1970–71 thru 1977–78

| School | Grades | 1970–71 | | | | 1971–72 | | | | 1972–73 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | W | B | T | %B | W | B | T | %B | W | B | T | %B |
| All Saints HS | 1–12 | 0 | 317 | 317 | 100% | 0 | 318 | 318 | 100% | 0 | 274 | 274 | 100% |
| DeSoto HS | 7–12 | 0 | 665 | 665 | 100% | 1 | 688 | 689 | 99% | 0 | 654 | 654 | 100% |
| Johnson Elem. School | 1–6 | 0 | 828 | 828 | 100% | 2 | 864 | 866 | 99% | 0 | 891 | 891 | 100% |
| Logansport HS | 1–12 | 467 | 41 | 508 | 8% | 465 | 25 | 490 | 5% | 483 | 27 | 510 | 5% |
| Logansport Rosen-wald HS | 1–12 | 0 | 462 | 462 | 100% | 0 | 471 | 471 | 100% | 0 | 451 | 451 | 100% |
| Mansfield Elem. School | 1–7 | 430 | 225 | 655 | 34% | 484 | 189 | 673 | 28% | 505 | 181 | 686 | 26% |
| Mansfield HS | 8–12 | 333 | 93 | 426 | 22% | 325 | 103 | 428 | 24% | 378 | 120 | 498 | 24% |
| Pelican HS | 1–12 | 132 | 114 | 246 | 46% | 120 | 102 | 222 | 46% | 124 | 104 | 228 | 46% |
| Second Ward HS | 1–12 | 0 | 846 | 846 | 100% | 0 | 791 | 791 | 100% | 0 | 736 | 736 | 100% |
| Stanley HS | 1–12 | 218 | 46 | 264 | 17% | 222 | 38 | 260 | 15% | 226 | 33 | 259 | 13% |
| Stonewall HS | 1–12 | 211 | 63 | 274 | 23% | 256 | 58 | 314 | 18% | 294 | 62 | 356 | 17% |
| Total | | 1791 | 3700 | 5491 | 67% | 1875 | 3647 | 5522 | 66% | 2010 | 3533 | 5543 | 64% |

| School | Grades | 1973-74 | | | | 1974-75 | | | | 1975-76 | | | | + | 1977-78 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | W | B | T | %B | W | B | T | %B | W | B | T | %B | W | B | T | %B |
| All Saints HS | K-12 | 0 | 270 | 270 | 100% | 3 | 237 | 240 | 99% | 7 | 242 | 249 | 97% | *32 | 186 | 218 | 85% |
| DeSoto HS | 7-12 | 0 | 672 | 672 | 100% | 0 | 652 | 652 | 100% | 0 | 700 | 700 | 100% | 0 | 610 | 610 | 100% |
| Johnson Elem. School | K-6 | 0 | 932 | 932 | 100% | 0 | 929 | 929 | 100% | 0 | 895 | 895 | 100% | `0 | 769 | 769 | 100% |
| Logansport HS | K-12 | 509 | 31 | 540 | 6% | 540 | 47 | 587 | 8% | 563 | 43 | 606 | 7% | 579 | 103 | 682 | 15% |
| Logansport Rosenwald HS | K-12 | 0 | 470 | 470 | 100% | 0 | 442 | 442 | 100% | 0 | 439 | 439 | 100% | 0 | 351 | 351 | 100% |
| Mansfield Elem. School | K-7 | 531 | 204 | 735 | 28% | 561 | 198 | 759 | 26% | 616 | 218 | 834 | 26% | 574 | 276 | 850 | 33% |
| Mansfield HS | 8-12 | 387 | 126 | 513 | 25% | 371 | 134 | 505 | 27% | 374 | 142 | 516 | 28% | 380 | 157 | 537 | 29% |
| Pelican HS | 1-12 | 121 | 98 | 219 | 45% | 119 | 102 | 221 | 46% | 112 | 97 | 209 | 46% | **33 | 155 | 188 | 82% |
| Second Ward HS | K-12 | 0 | 747 | 747 | 100% | 0 | 718 | 718 | 100% | 0 | 695 | 695 | 100% | 0 | 592 | 592 | 100% |
| Stanley HS | K-12 | 226 | 36 | 262 | 14% | 244 | 32 | 276 | 12% | 241 | 25 | 266 | 9% | 251 | 91 | 342 | 27% |
| Stonewall HS | K-12 | 347 | 75 | 422 | 18% | 405 | 74 | 479 | 15% | 403 | 68 | 471 | 14% | 420 | 126 | 546 | 23% |
| Total | | 2121 | 3661 | 5782 | 63% | 2243 | 3565 | 5808 | 61% | 2316 | 3564 | 5880 | 61% | 2269 | 3416 | 5685 | 60% |

Appendix B to follow.

+ The Court was unable readily to find similar figures for the 1976 77 school year in the record.

* All Saints—Pelican Elementary School (after pairing)

** Pelican—All Saints High School (after pairing)

APPENDIX B

DeSoto Parish School System Faculty At Each School By Race
1970-71 thru 1977-78

| School | 1970-71 | | | | 1971-72 | | | | 1972-73 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B | W | T | %B | B | W | T | %B | B | W | T | %B |
| All Saints HS | 16 | 2 | 18 | 89% | 16 | 4 | 20 | 80% | 15 | 4 | 19 | 79% |
| DeSoto HS | 28.5 | 6 | 34.5 | 83% | 27 | 9 | 36 | 75% | 26 | 9 | 35 | 74% |
| Johnson Elem. School | 26.5 | 3 | 29.5 | 90% | 25 | 6 | 31 | 81% | 24 | 8 | 32 | 75% |
| Logansport HS | 8 | 21 | 29 | 28% | 8 | 22 | 30 | 27% | 7 | 22 | 29 | 24% |
| Logansport Rosenwald HS | 15 | 7 | 22 | 68% | 18 | 6 | 24 | 75% | 18 | 6 | 24 | 75% |
| Mansfield Elem. School | 8 | 21.5 | 29.5 | 27% | 9 | 20 | 29 | 31% | 9 | 20 | 29 | 31% |
| Mansfield HS | 6 | 18.5 | 24.5 | 24% | 6 | 18 | 24 | 25% | 6 | 20 | 26 | 23% |
| Pelican HS | 6 | 10 | 16 | 38% | 6 | 10 | 16 | 38% | 6 | 9 | 15 | 40% |
| Second Ward HS | 37 | 3 | 40 | 93% | 34 | 7 | 41 | 83% | 31 | 9 | 40 | 78% |
| Stanley HS | 5 | 10 | 15 | 33% | 5 | 10 | 15 | 33% | 5 | 10 | 15 | 33% |
| Stonewall HS | 5 | 10 | 15 | 33% | 5 | 10 | 15 | 33% | 5 | 13 | 18 | 28% |
| Special Teachers | 3 | 3 | 6 | 50% | 4 | 4 | 8 | 50% | 5 | 8 | 13 | 38% |
| Assistant Teachers | 0 | 0 | 0 | — | 1 | 2 | 3 | 33% | 4 | 3 | 7 | 57% |
| Total | 164 | 115 | 279 | 59% | 164 | 128 | 292 | 56% | 157 | 138 | 302 | 52% |

| School | 1973–74 | | | | 1974–75 | | | | 1975–76 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B | W | T | %B | B | W | T | %B | B | W | T | %B |
| All Saints HS | 16 | 4 | 20 | 80% | 14 | 4 | 18 | 78% | 13 | 5 | 18 | 72% |
| DeSoto HS | 27 | 10 | 37 | 73% | 27 | 9 | 36 | 75% | 27 | 10 | 37 | 73% |
| Johnson Elem. School | 30 | 10 | 40 | 75% | 30 | 10 | 40 | 75% | 30 | 11 | 41 | 73% |
| Logansport HS | 8 | 22 | 30 | 27% | 8 | 23 | 31 | 26% | 8 | 23 | 31 | 26% |
| Logansport Rosenwald HS | 21 | 7 | 28 | 75% | 21 | 8 | 29 | 72% | 17 | 12 | 29 | 59% |
| Mansfield Elem. School | 9 | 22 | 31 | 29% | 9 | 22 | 31 | 29% | 9 | 24 | 33 | 27% |
| Mansfield HS | 6 | 21 | 27 | 22% | 6 | 21 | 27 | 22% | 6 | 22 | 28 | 21% |
| Pelican HS | 6 | 11 | 17 | 35% | 6 | 11 | 17 | 35% | 4 | 13 | 17 | 24% |
| Second Ward HS | 33 | 9 | 42 | 79% | 33 | 9 | 42 | 79% | 33 | 9 | 42 | 79% |
| Stanley HS | 5 | 11 | 16 | 31% | 5 | 11 | 16 | 31% | 5 | 11 | 16 | 31% |
| Stonewall HS | 5 | 15 | 20 | 25% | 6 | 16 | 22 | 27% | 6 | 17 | 23 | 26% |
| Special Teachers | 3 | 4 | 7 | 43% | 3 | 6 | 9 | 33% | 4 | 5 | 9 | 44% |
| Total | 169 | 146 | 315 | 54% | 168 | 150 | 318 | 53% | 162 | 162 | 324 | 50% |

| School | 1976–77 | | | | 1977–78 | | | |
|---|---|---|---|---|---|---|---|---|
| | B | W | T | %B | B | W | T | %B |
| All Saints HS | *5 | 5 | 10 | 50% | 7 | 5 | 12 | 58% |
| DeSoto HS | 24 | 9 | 33 | 73% | 26 | 9 | 35 | 74% |
| Johnson Elem. School | 26 | 7 | 33 | 79% | 27 | 7 | 34 | 77% |
| Logansport HS | 8 | 24 | 32 | 22% | 10 | 26 | 36 | 28% |
| Logansport Rosenwald HS | 15 | 7 | 22 | 68% | 16 | 8 | 24 | 67% |
| Mansfield Elem. School | 10 | 25 | 35 | 29% | 12 | 26 | 38 | 32% |
| Mansfield HS | 6 | 22 | 28 | 21% | 7 | 22 | 29 | 24% |
| Pelican HS | **5 | 8 | 13 | 38% | 5 | 8 | 13 | 38% |
| Second Ward HS | 27 | 7 | 34 | 79% | 27 | 10 | 37 | 73% |
| Stanley HS | 6 | 12 | 18 | 34% | 6 | 14 | 20 | 30% |
| Stonewall HS | 7 | 19 | 26 | 27% | 8 | 20 | 28 | 28% |
| Special Teachers | 5 | 3 | 8 | 62% | 4 | 6 | 10 | 40% |
| Total | 144 | 148 | 302 | 50% | 155 | 161 | 316 | 50% |

* All Saints—Pelican Elementary School (after pairing)

** Pelican—All Saints High School (after pairing)

GEE, Circuit Judge (specially concurring):

I concur in the opinion and write briefly and only to note how my reading of *Brinkman*[1] bears on this case. There can be little doubt that the drastic and unfortunate means of "bussing for racial balance" can be required in a case where the existing imbalance sought to be corrected results from present intent—or the remaining effects of past intent—to discriminate by race on the part of those controlling school policy. Mere statistical imbalance by race does not, in my view, justify such a remedy. But where extreme imbalance exists, as here and as in *Lee*,[2] and where, as here and as in *Lee*, it has persisted essentially unbroken by milder remedies since the abolition of *de jure* segregation, it is powerful evidence that such an intent either presently exists or persists undisturbed from the older dispensation. If sufficiently extreme, at least where residential patterns are not polarized, as here, it may be overwhelming evidence of such an intent presently operating. I find it overwhelming here, as in *Lee*. I therefore concur, believing that *Brinkman*, which incorporates the language cited at footnote 20 above, is not at war with our holding.

[1] *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977).

[2] *Lee v. Demopolis City School System*, 557 F.2d 1053 (5th Cir. 1977).