Eddie Mitchell TASBY, et al., Plaintiffs,

v.

Dr. Linus WRIGHT, General Superintendent, Dallas Independent School District, et al., Defendants.

Civ. A. No. 3–4211–H.

United States District Court,
N. D. Texas,
Dallas Division.

Dec. 7, 1981.

Judgment Feb. 1, 1982.

Order Feb. 26, 1982.

See also, D.C., 520 F.Supp. 683.

Edward B. Cloutman, III, Mullinax, Wells, Baab, Cloutman & Chapman, Patrick A. White, Dallas Legal Services Foundation, Inc., Dallas, Tex., for plaintiffs.

Mark Martin and Robert H. Thomas, Strasburger & Price, Dallas, Tex., for DISD, Wright, et al.

Thomas I. Atkins, Gen. Counsel, NAACP Sp. Contribution Fund, New York City, Ernest Lemuel Haywood, Mahomes, Biscoe & Haywood, Dallas, Tex., for NAACP (intervenor).

James A. Donohoe, Gardere & Wynne, Dallas, Tex., for Brinegar, et al. (intervenors).

Robert B. Blumenthal, John Martin and George Kryder, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for Curry, et al. (intervenors).

H. Ron White, H. Ron White & Associates, Dallas, Tex., for Dallas Alliance (amicus curiae).

E. Brice Cunningham, Dallas, Tex., for Cunningham and Dockery (intervenors).

Joan T. Winn, Dallas, Tex., for Black Coalition to Maximize Education (intervenor).

## MEMORANDUM OPINION

SANDERS, District Judge.

The Court has carefully reviewed the Minority Neighborhood Option Plan (MNOP) submitted by the Dallas Independent School District (DISD) and is of the opinion that it should be disapproved.

Under the desegregation plan set in place in 1976 for the Dallas school system and still in operation today, students in grades 4 through 8, who do not live in naturally integrated areas, are assigned and transported to centrally located centers in the Northwest, Northeast and Southeast subdistricts. *Tasby v. Estes*, 412 F.Supp. 1192, 1214 (N.D.Tex.1976), *remanded with instructions*, 572 F.2d 1010 (5th Cir. 1978). The East Oak Cliff and Seagoville schools, and naturally integrated areas (including the Southwest subdistrict), are not included in these student assignment patterns.

Pursuant to the Fifth Circuit remand, this Court held four weeks of hearings in April and May 1981 to assess the constitutional adequacy of the 1976 plan. No testimony focused specifically on either the 4–6 or 7–8 grade schools or the student assignment plan in effect for these grades. Strong opposition was expressed, however, by a significant number of minority parents to the use of traditional racial balance remedies such as transportation to cure the effects of school segregation. Noting the depth and breadth of the objections raised to the further use of such remedies, the Court in its August 3, 1981, Opinion directed counsel "to analyze the feasibility, and the legality, of giving minority students the option to remain in their neighborhood 4–8 centers and waive their constitutional right to be assigned and transported to a desegregated school—in other words, to 'opt out' of busing." *Tasby v. Wright*, 520 F.Supp. 683, 750 (N.D.Tex.1981).

On October 13, 1981, the DISD submitted a proposed desegregation plan which included the MNOP. Under the terms of the MNOP, schools serving grades 4–6 would be reopened in South Dallas, near North Dallas and West Dallas. Schools serving grades 7–8 would also be reopened in South Dallas and West Dallas. These schools would be made available, to the extent their capacity permits, to receive students residing in these areas who are currently being transported to receiving 4–6 and 7–8 centers in northwest, northeast, and southeast Dallas. Under the criteria proposed by the District, a student's request for MNOP transfer would not be granted if it would cause the enrollment at any 4–6 or 7–8 receiving center to become predominantly anglo. The program likewise would not permit MNOP transfers to result in overcrowding at the newly opened MNOP schools.

The MNOP proposal is opposed by the Plaintiffs, and the NAACP and Cunningham Intervenors on the grounds that its implementation will result in the unjustified creation of additional one-race schools and that the legal theory underlying the program will not withstand constitutional scrutiny. The Black Coalition and Brinegar Intervenors support the MNOP.

The Court has carefully reviewed the MNOP proposal, the detailed provisions for its execution and the brief submitted by DISD in support of its constitutional adequacy. Allowing minority students disenchanted with the results of court-ordered transportation to waive their constitutional right to a desegregated education is a concept which has considerable merit in both law and equity. The constraints imposed by the directions of the Fifth Circuit remand, however, and the other factors set forth in this Memorandum Opinion, have led the Court to conclude that the MNOP proposal is not acceptable.

A legal theory which would afford minority students the right to forego participation in racial balance remedies such as transportation appears to conflict with the traditional precepts which have underpinned controlling school desegregation jurisprudence. Ever since *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), judicial consideration of school desegregation cases has begun with the standard:

[I]n the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal.

*Id.* at 495, 74 S.Ct. at 692. Thus, the overriding responsibility of this Court is "to eliminate from the public schools all vestiges of state-imposed segregation." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 14, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). To the extent that the practicalities of the situation permit, the Court must "make every effort to achieve the greatest possible degree of actual desegregation . . . ." *Id.* at 26, 91 S.Ct. at 1281. *See also Davis v. Board of School Commissioners of Mobile County*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1291, 28 L.Ed.2d 577 (1971). This principle has been repeatedly affirmed by the higher courts and governs this Court as it seeks to fashion an equitable desegregation decree.

■ The criterion for determining the validity of provisions in a desegregation plan is whether they are reasonably related to these ultimate objectives. *Valley v. Rapides Parish School Board*, 646 F.2d 925 (5th Cir. 1981); *United States v. Jefferson County Board of Education*, 372 F.2d 836 (5th Cir. 1966). A desegregation plan must promise meaningful and immediate progress toward disestablishing state-imposed segregation. "The burden on a school board today is to come forward with a plan that promises realistically to work and promises realistically to work *now*." *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) (emphasis in original).

Although these precedents control, the significant portion of the Dallas minority community which opposes mandatory transportation should not be ignored. The apparently escalating sentiment against such racial balance remedies has different roots. Testimony during the April and May 1981

hearings revealed that some in the minority community considered mandatory transportation unacceptable because its burdens had been disproportionately imposed on minority children. Many minority witnesses preferred remedies designed to improve educational quality and to eliminate the disparity in academic achievement that can be attributed to past segregation. It is important to note, however, that the disapproval of racial balance remedies by these minority parents was not presented as a rejection of the constitutional principles vindicated in *Brown*, and the hundreds of school desegregation decisions since *Brown*. Rather, the dispute is about the most effective remedies to eliminate the vestiges of school segregation.

The vexing problem which faces this Court is whether the opposition of this body of minority parents and students can feasibly and legally be accommodated in fashioning a constitutional desegregation remedy for the Dallas school system. One vehicle for implementing a program such as the MNOP might be the opt-out mechanism for class actions in Rule 23(b)(2), Federal Rules of Civil Procedure. Minority 4–6 and 7–8 grade students could choose to opt-out of the class-based relief of transportation in these grades. *See Penson v. Terminal Transport Co.*, 634 F.2d 989, 993 (5th Cir. 1981). The school district suggests that the proper procedural framework is to be found in the closely analogous powers of the Court under Rule 23(c)(4) to treat this action as a class action with respect to particular issues and to divide the class into subclasses on the issue of relief. Under this latter theory, the Court could distinguish between that portion of the class primarily seeking *Swann* transportation remedies and the portion of the class seeking compensatory educational components as the primary remedy.

Whatever the procedural framework adopted or legal authority relied upon, it is clear that the implementation of any provision allowing minority students to elect not to participate in desegregative transportation may be impossible to reconcile with traditional principles of maximum desegregation. Under the terms of the MNOP, for example, 22 K–3 schools in South, near North, and West Dallas would be expanded into K–6 centers and currently transported minority students could choose to attend one of these neighborhood schools. All of these proposed centers, however, already have predominantly minority enrollments in grades K–3. Any minority student in grades 4–6 who returned to these schools would leave a desegregated classroom to enter a segregated one. The inevitable result would be an increase in minority concentration in all of these schools.

An even more difficult problem would be posed if all minority students in these grades who are now being transported elect to remain in their neighborhood schools. The enrollments at over 15 of the present 4–6 receiving centers would then cease to be desegregated and would become predominantly anglo. DISD argues that the selection criteria developed for the MNOP and capacity problems at the neighborhood 4–6 schools would prevent the shift of any schools from current desegregated status. However, if a constitutionally-based right for minority students to waive transportation to a desegregated school is accepted, the Court doubts that the right can arbitrarily be limited, either equitably or legally, to only some of the minority students.

The Court has this dilemma. On the one hand, controlling principles of school desegregation law make it difficult to approve a proposal like MNOP which would very likely reverse the current desegregation in grades 4–8. On the other hand, the Court believes that in the proper circumstances basic rules of equity may soon force a shift in these long accepted legal principles to accommodate the growing disagreement in minority communities over the nature of desegregative relief. The 27 years since *Brown I* have exacted a toll on the traditional goals of school desegregation litigation; the remedies designed for the 1980's may have to be dramatically different from those developed in the past. Before a program such as the MNOP could be adopted, though, questions such as the equal protection implications for anglo students not af-

forded the waiver opportunity, and the impact of such a program on minority children who choose not to waive, must be carefully studied. Preliminary inspection of these issues persuades the Court that they are not insurmountable, and that a constitutional basis exists to support a waiver or opt out program. The Court is of the opinion, however, that the procedural stance of the Dallas school litigation requires disapproval of the MNOP.

■ The Court must consider the MNOP within the framework of the 1978 remand from the Fifth Circuit. *Tasby v. Estes*, 572 F.2d 1010 (5th Cir. 1978). The Circuit expressed concern about the number of one-race schools under the 1976 plan, and specifically directed this Court to evaluate the application of *Swann* mandatory transportation techniques to K–3 schools, high schools and schools in East Oak Cliff. In addition, the remand required this Court to "reevaluate the effectiveness of the magnet school concept", 572 F.2d at 1015, and "to consider assigning anglo students to the [Nolan Estes Educational Plaza] complex" located in East Oak Cliff. 572 F.2d at 1017.

The student assignment provisions for grades 4–8, implemented in 1976, have not previously been attacked by any party to the litigation, either before the Fifth Circuit or before the United States Supreme Court. In its instructions to this Court the Circuit did not indicate any disapproval of the 4–8 desegregation program nor did it direct that any further justification be provided for that program. This Court therefore concludes that it is not free to authorize the drastic change in 4–8 desegregative busing that the MNOP would entail.

The Court also notes that mandatory transportation in grades 4–8 has now been in effect in DISD for over five years. Concerned though it is about the seemingly erratic nature of some of the 4–8 assignments, the Court nevertheless believes that a major change such as the MNOP in the school assignments for these minority children after this length of time would adversely affect the stability of the desegregation already achieved.

The situation before this Court reflects the unique history of numerous years of litigation in the Dallas school district. The decision on whether to adopt a program such as the MNOP might well be different if the Court were in the position of adopting a systemwide transportation remedy at the outset of the litigation or of imposing *Swann* transportation requirements in grades K–3, 9–12, or East Oak Cliff.

This ruling should not be interpreted, however, to foreclose any future petition by the DISD or any other party to the litigation to modify the 4–8 transportation program in the light of enrollment shifts which have caused particular receiving schools to become predominantly minority. And this opinion is, of course, without prejudice to the consideration of some form of MNOP, or other substantial change, if and when minorities (who comprise over 70% of the pupils in DISD) control the school board and the school administration. In Atlanta, where white students comprised a small minority and black citizens controlled school policy, administration, and staffing, the Fifth Circuit found that "based on live, present reality [the school system] was free of racial discrimination" although racial integration had not been achieved in Atlanta schools. *Calhoun v. Cook*, 522 F.2d 717, 720 (5th Cir. 1975).

In sum, then, the theory and the practicalities of the DISD neighborhood option plan collide with the command of the law to achieve maximum school desegregation. When the instructions of the Fifth Circuit in *Tasby v. Estes, supra,* are taken into consideration, the option plan must yield.

The Minority Neighborhood Option Plan (MNOP) is therefore DISAPPROVED.

SO ORDERED.

## JUDGMENT

This Judgment constitutes the Desegregation Plan for the Dallas Independent School District ("DISD" or "the District") and is rendered pursuant to, and is to be construed in the light of and consistent with, (1) the Court's Memorandum Opinion

dated August 3, 1981; (2) the Stipulation dated December 1, 1981, and approved by the Court on December 2, 1981; and (3) the Court's Memorandum Opinions and Orders dated December 7, 1981; December 21, 1981; January 4, 1982; and February 1, 1982. This Judgment supersedes the final judgment rendered by this Court in 1976. All programs provided for in this Judgment must be initiated by the beginning of the DISD 1982–83 school year, or sooner if feasible, unless otherwise herein provided.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court, as follows:

# I.

## SUBDISTRICTS

A. *Present Subdistricts.* The DISD shall be divided for administrative purposes into five subdistricts, designated, respectively, the Northwest, Northeast, Southwest, East Oak Cliff, and Southeast Subdistricts. The subdistricts shall consist of the attendance zones of the following high schools:

| | | |
|---|---|---|
| 1. | Northwest Subdistrict | Hillcrest |
| | | L. G. Pinkston |
| | | North Dallas |
| | | Thomas Jefferson |
| | | W. T. White |
| 2. | Northeast Subdistrict | Bryan Adams |
| | | James Madison |
| | | Skyline |
| | | Woodrow Wilson |
| 3. | Southwest Subdistrict | David W. Carter |
| | | Justin F. Kimball |
| | | Sunset |
| | | W. H. Adamson (excluding the attendance zone of the Harrell Budd Elementary School) |
| 4. | East Oak Cliff Subdistrict | A. Maceo Smith |
| | | Franklin D. Roosevelt |
| | | South Oak Cliff |
| | | W. H. Adamson (Harrell Budd Elementary School attendance zone only) |
| 5. | Southeast Subdistrict | H. G. Spruce |
| | | Lincoln |
| | | Seagoville |
| | | W. W. Samuell |

B. *Subdistrict Changes.* No later than the start of the 1984–85 school year, the DISD shall be realigned into three subdistricts, which shall consist of the attendance zones of the following high schools:

| | | |
|---|---|---|
| 1. | Subdistrict I | Hillcrest |
| | | L. G. Pinkston |
| | | North Dallas |
| | | Thomas Jefferson |
| | | W. H. Adamson (excluding the attendance zone of the Harrell Budd Elementary School) |
| | | W. T. White |
| | | Woodrow Wilson |
| 2. | Subdistrict II | A. Maceo Smith |
| | | David W. Carter |
| | | Justin F. Kimball |
| | | Franklin D. Roosevelt |
| | | South Oak Cliff |
| | | Sunset |
| | | W. H. Adamson (Harrell Budd Elementary School attendance zone only) |
| 3. | Subdistrict III | Bryan Adams |
| | | H. G. Spruce |
| | | James Madison |
| | | Lincoln |
| | | Seagoville |
| | | Skyline |
| | | W. W. Samuell |

The Harrell Budd Elementary School is currently assigned for administrative purposes to the East Oak Cliff subdistrict, and to Subdistrict II under the realignment plan. Some students in the Budd attendance zone, however, are assigned to the W. H. Adamson High School in the Southwest Subdistrict and the proposed Subdistrict I, in order to continue the attendance patterns in place since 1976.

# II.

## STUDENT ASSIGNMENTS AND ATTENDANCE ZONES

The geographic boundaries of the attendance zones for K–3 schools and the feeder patterns for 4–6, 7–8, and 9–12 schools shall be as set forth respectively in Appendices A and B to this Judgment, unless otherwise specified herein. Attendance zones and student assignments shall not be changed without prior written approval of the Court. Grade level configurations will be standard throughout the District with K–3, 4–6, 7–8 and 9–12 schools.

A. *School Closings.* The following schools shall be closed and their attendance zones consolidated as shown:

| Closed | Consolidated With |
|--------|-------------------|
| Nathan Adams | Tom C. Gooch |
| George B. Dealey | J. J. Pershing |
| E. L. DeGolyer | Herbert Marcus |
| T. C. Hassell | Paul L. Dunbar (north of Route 352) Phyllis Wheatley (south of Route 352) |
| Arthur Kramer | Preston Hollow |
| Rylie | Richard Lagow Nancy Moseley |
| Harry Withers | Walnut Hill |

B. *K–3 Attendance Zone Changes.* The following changes shall be made to the attendance zones for K–3 schools:

1. The areas bounded by Morris Avenue, Chihuahua Avenue, Singleton Boulevard, and Vilbig Road, and by Singleton Boulevard, Vilbig Road, the Santa Fe Railroad, and Hampton Road, shall be rezoned from the Lorenzo DeZavala attendance zone to the C. F. Carr attendance zone.

2. The portion of the San Jacinto attendance zone north of Scyene Road shall be rezoned to the Urban Park attendance zone.

3. The area bounded by Central Expressway, Haskell Avenue, Ross Avenue, and Carroll Avenue shall be rezoned from the James W. Fannin attendance zone to the Ben Milam attendance zone.

4. The area bounded by R. L. Thornton Freeway, Fitzhugh Avenue, Grand Avenue, and Bank Street shall be rezoned from the O. M. Roberts attendance zone to the F. C. Harris attendance zone.

5. The area bounded by Fitzhugh Avenue, Sycamore Street, Munger Boulevard, Live Oak Street, Beacon Street, and Swiss Avenue shall be rezoned from the James W. Fannin attendance zone to the W. Lipscomb attendance zone.

6. The area bounded by Fitzhugh Avenue, Victor Street, Prairie Avenue, and Worth Street shall be rezoned from the David Crockett attendance zone to the W. Lipscomb attendance zone.

7. If and when it is no longer needed for the Health Professions Magnet School, the facility at 4515 Ross Avenue may be used as a K–3 school for part or all of the students from the James W. Fannin attendance zone (as modified above).

C. *4–6 Feeder Pattern Changes.* The feeder patterns for grades 4–6 in place under the 1976 court order shall be changed as follows:

1. Students living in the portion of the former T. C. Hassell K–3 attendance zone north of Route 352 shall attend the N. Hawthorne and A. W. Blanton Schools in grades 4–6 and the Fred Florence School in grades 7–8. Students living in the portion of the former T. C. Hassell K–3 attendance zone south of Route 352 shall attend the Alex Sanger School in grades 4–6 and the Robert T. Hill School in grades 7–8.

2. Students living in the former Nathan Adams K–3 attendance zone shall attend the Walnut Hill School in grades 4–6.

3. Students living in the former Harry Withers K–3 attendance zone shall attend Henry W. Longfellow School in grades 4–6.

4. Students who formerly attended Rylie 4–6 school, closed pursuant to this Judgment, shall attend the R. C. Burleson, Richard Lagow, and Nancy Moseley schools in grades 4–6.

5. Students living in the Richard Lagow K–3 attendance zone shall attend the Richard Lagow and R. C. Burleson Schools in grades 4–6.

6. Students living in the Nancy Moseley K–3 attendance zone shall attend the Nancy Moseley and R. C. Burleson Schools in grades 4–6.

7. Students living in the R. C. Buckner K–3 attendance zone shall attend the R. C. Burleson, Richard Lagow, and Nancy Moseley Schools in grades 4–6.

8. J. C. Dorsey shall become a neighborhood K–6 school.

9. Students whose K–3 school assignment is altered in Section II(B) hereof shall attend the 4–6 schools to which their new K–3 schools are assigned.

10. Students in the J. W. Ray K–3 attendance zone shall attend the Bayles School in grades 4–6.

11. Students in the G. W. Carver K–3 attendance zone shall attend the Stephen C. Foster and J. J. Pershing Schools in grades 4–6.

12. Students in the A. Earhart K–3 attendance zone shall attend the Henry W. Longfellow School in grades 4–6.

D. *7–8 Feeder Pattern Changes.* The feeder patterns for grades 7–8 under the 1976 Order shall be changed as follows:

1. Students in the Henry W. Longfellow, K. B. Polk, and Sudie Williams K–3 attendance zones shall attend T. C. Marsh 7–8 school.

2. Students in the former DeGolyer K–3 attendance zone shall attend E. H. Cary 7–8 school.

3. Students in the portions of the W. Lipscomb and Mt. Auburn K–3 attendance areas south of Grand Avenue, and all students in the Alex Sanger K–3 attendance zone, shall attend W. H. Gaston 7–8 school.

4. Students whose K–3 school assignment is altered in Section II(B) hereof shall attend the 7–8 school to which their new K–3 school is assigned.

E. *9–12 Attendance Zone Changes.* Attendance zones for students in grades 9–12 shall be changed as follows:

1. Students in the Bayles K–3 attendance zone shall have the option to attend Skyline or Woodrow Wilson High Schools.

2. Students in the J. W. Ray K–3 attendance zone shall have the option to attend North Dallas or Hillcrest High Schools, commencing in 1982–83. The Court will review the Ray option in spring, 1983, to determine if any further change should be made.

3. Students in the Henry W. Longfellow, K. B. Polk, and Sudie Williams K–3 attendance zones shall attend W. T. White High School.

4. Students in the Herbert Marcus K–3 attendance zone, as expanded in Section II(A) hereof to include the former E. L.

DeGolyer K–3 zone, shall attend Thomas Jefferson High School.

5. Students in the portions of the W. Lipscomb and Mt. Auburn K–3 attendance zones south of Grand Avenue, and all students in the Alex Sanger K–3 attendance zone, shall attend Bryan Adams High School.

6. Students whose K–3 school assignment is altered in Section II(B) hereof shall attend the 9–12 schools to which their new K–3 schools are assigned.

F. *Implementation of Student Assignment Changes.*

1. The changes specified in paragraphs 10, 11 and 12 of Section II(C) hereof shall be implemented for the fourth grade beginning in the school year 1982–83, for the fifth grade beginning in the school year 1983–84, and for the sixth grade beginning in the school year 1984–85.

2. The changes specified in paragraphs 1, 2 and 3 of Section II(D) hereof shall be implemented for the seventh grade beginning in the school year 1982–83 and for the eighth grade beginning in the school year 1983–84.

3. The changes specified in paragraphs 3, 4, and 5 of Section II(E) hereof shall be implemented for the ninth grade beginning in the school year 1982–83, for the tenth grade beginning in the school year 1983–84, for the eleventh grade beginning in the school year 1984–85, and for the twelfth grade beginning in the school year 1985–86.

4. The assignments in grades 4–6 set forth in paragraphs 3 and 4 of Section II(C) hereof represent no change from those in effect during the 1981–82 school year. They are listed only to clarify the assignments in these schools since DISD amended its original proposal that they be changed.

5. All other student assignment changes specified herein shall be implemented beginning in the school year 1982–83.

6. The DISD is directed to review the feeder patterns in effect for grades 4–6 and 7–8 throughout the District to determine if a revised pattern can be developed which will minimize the transportation and dislo-

cation of students and relieve overcrowded schools, without adversely affecting the present degree of desegregation. DISD shall submit by November 1, 1982, a report and recommendations, if any, on the results of this review.

7. The specification of attendance zones and feeder patterns for K–3, 4–6, 7–8 and 9–12 schools in this Judgment does not foreclose alterations to reflect changing enrollment patterns, overcrowding, etc., upon proper motion to the Court.

## III.

### MAJORITY–TO–MINORITY TRANSFER

The DISD shall continue the Majority-to-Minority (M–M) transfer option in accordance with the following guidelines:

A. *Eligibility Criteria.*

1. Any anglo student in a school in which the percentage of anglo students is greater than fifty percent (50%) may transfer to any school in the District in which the percentage of anglo students is less than fifty percent (50%). Any ethnic minority student in a school in which the percentage of ethnic minority students is greater than fifty percent (50%) may transfer to any school in the District in which the percentage of ethnic minority students is less than sixty percent (60%).

2. No student attending a school under a Majority-to-Minority transfer in the 1981–82 school year shall be forced to leave that school through application of the above formula and shall be allowed to graduate from that school.

3. Students can apply for Majority-to-Minority transfers at any time during the year, until one week before the beginning of fall classes. If spaces or schools open after the annual fall class leveling process, students with applications on file will be allowed to transfer up to September 15. Students must agree to participate in the program for the entire year, except that a student transferring for the first time will have the option to return to his/her home school at the end of the first semester.

4. Students new to the District can apply for an M–M transfer upon enrollment without regard to the deadlines in paragraph 3.

5. All transfers provided for in this section shall be permitted on the basis of student-station availability, and Majority-to-Minority transfers will be given preference over all other transfers.

6. The DISD shall review annually the eligibility criteria for the Majority-to-Minority program to ensure that the M–M program is effective as a desegregation tool and that the enrollment trend at any school is not toward predominantly one race through the operation of the option. A summary of the results of this review and any recommendations for amendment of the criteria shall be included in the annual April 15 report.

7. A student's disciplinary record shall not constitute the basis for denying a Majority-to-Minority transfer, or for sending him/her back to a previously assigned school after a transfer has been made. Any discipline problem shall be handled at the school to which a student has transferred.

B. *Majority-to-Minority Incentives.* The District shall provide the special incentives outlined below, and any others deemed necessary, to encourage use of the M–M transfer option:

1. A commitment that Majority-to-Minority students will have equal access and opportunity to participate in extracurricular activities.

2. Instruments and tuition-free participation in music enrichment programs will be provided in elementary schools where such programs are offered.

3. A tuition-free semester at a Dallas County Community College will be provided for each year a high school student spends in the M–M program. Eligible students must show proof of acceptance and enrollment in the DCCCD system. A maximum of $400 will be available for each eligible student.

4. A special counseling service will be provided for M–M students at all levels.

5. A continuing information program, including a special ombudsman service, will be provided for parents of M–M students.

6. The equivalent salary of one personnel unit will be provided to sending schools for each *100* students who transfer as M–M students. Such funds must be used for personnel, materials, or other areas designed to improve instruction.

7. Staff salaries based upon enrollment size will in no way be affected by the numbers of students transferring out of a school under the Majority-to-Minority program.

8. University Interscholastic League eligibility will go with students to their new school, and can be transferred back to their originally assigned school *once.*

C. *Majority-to-Minority Transportation.* Free transportation will be provided for all M–M students. The following guidelines will govern transportation plans:

1. School-to-school transportation by school bus will be provided for a minimum of 10 students.

2. A minimum of 15 students will be transported on routes involving at least two sending schools. Whenever one school has fewer than ten M–M students requiring transportation, two schools should be incorporated into one route if possible.

3. Public transportation, reimbursed private transportation, or other transportation arrangements will be made at DISD expense for M–M students not provided for in paragraphs 1 and 2.

4. School-to-school transportation will be provided for a minimum of five students who remain to participate in extracurricular activities. Appropriate transportation arrangements will be made for less than five students who remain after school, *e.g.* special buses or vans assigned to campuses, through coaches or other staff, or District-reimbursed parent drivers.

5. In the event of emergencies or illness, the school shall, at DISD expense, either arrange transportation to home or make such other appropriate accommodations as are deemed necessary.

6. The DISD shall submit its plan for transportation developed pursuant to these guidelines prior to the beginning of the 1982–83 school year for review by the Court.

D. *Majority-to-Minority Publicity.* At a time which provides sufficient notice for the upcoming school year, the District shall fully advise all eligible students and their parents of the M–M program and encourage their participation. Information efforts shall include, but should not be limited to, the following:

1. The preparation and distribution of brochures, posters, flyers, and other printed materials to all eligible students, parents, and community groups. A supplement shall be prepared for each 7–8 and 9–12 school which lists the schools to which a student may transfer into or out of under M–M.

2. Presentations at meetings and other gatherings of parents and community groups.

3. Recruiting presentations to students.

4. Publicity through all media sources including minority and community outlets. The DISD shall consider the suggestions for M–M publicity contained in Section I of the desegregation plan of the Black Coalition to Maximize Education.

5. Direct mail to parents of eligible students at least once each year containing the brochure and, where appropriate, the supplement for 7–8 and 9–12 students mentioned in paragraph 1 above.

The Court will hold DISD and its staff responsible for ensuring that the M–M program is effectively publicized and administered. The principal test of the program's effectiveness will be, of course, the number of students who utilize it. (The Court notes that DISD anticipates that 3000 students may participate in M–M under the new procedures and emphases outlined by the DISD in its October 13, 1981, Desegregation Plan.)

IV.

CURRICULUM TRANSFERS

Students who seek special courses that are not offered in their home schools shall

be permitted to attend those schools offering those courses, provided that all such transfers shall be on a nondiscriminatory basis. Such transfers shall be permitted on a space-available basis with final decisions to be made by the DISD. The Court notes that transfers under the Minority-to-Majority program pursuant to the 1976 Judgment are now implemented through the Curriculum Transfers program.

Transfers pursuant to this section should be carefully reviewed by DISD for the impact which they will have on desegregation at the relevant school, particularly in the areas of highly gifted and career education courses.

## V.

## MAGNET SCHOOLS

The Court has determined that magnet schools (4–6 vanguards, 7–8 academies, and 9–12 schools) are a useful desegregative tool. The Court reconfirms the centrality concept for the location of magnet high schools.

A. *New Magnet Programs.*

1. The DISD shall implement one or two Science/Engineering clusters at the Nolan Estes Plaza in the fall of 1982 on a temporary basis. These clusters will be moved to and incorporated in the Science/Engineering and Technology Magnet High School when it opens on its permanent site. The cluster programs will be one-half day in length with students taking academic courses not included in the cluster at either their home school or at A. Maceo Smith High School. The program will be open to ninth and tenth grade students from throughout the District in 1982–83 and to eleventh and twelfth grade students in 1983–84.

2. A program designed for the education of identified academically talented and gifted (TAG) high school students shall be incorporated into the District's instructional plan. The program will be housed at L. G. Pinkston High School and will be directed by specialists from the already existing TAG program. Resource classrooms and a science laboratory will be provided for a team of eight teachers. Students will be scheduled into four subject areas: language arts, social science, mathematics, and science. Curriculum for each discipline will be correlated to the requirements of DISD baselines and TEA requirements. TAG strategies will be used to teach the subject content. Scheduling will allow for electives offered through Pinkston's regular school program. If time and scheduling permit, electives may also be offered within the TAG program by the TAG teachers.

The program will be implemented for grades 9 and 10 in 1982–83 and for grades 11 and 12 in 1983–85.

B. *Magnet School Relocations.* The District shall:

1. Conduct a feasibility study to determine if it is realistic for the DISD to sell central business district property for the purpose of constructing and improving magnet school facilities. This study shall be completed and a report filed with the Court no later than *March 15, 1982.*

2. Construct a new magnet facility and career development center for grades 9–12 along the lines of Skyline High School as a first priority at a site to be determined if funds become available from the sale of central business district property.

3. Subject to Court approval, centralize the magnet high school programs the DISD deems appropriate, with the exception of the Multiple Careers Magnet Center, Lincoln Communications/Humanities Magnet, and the Arts Magnet High School at Booker T. Washington. The proposed Science/Engineering and Technology School shall be included at the new comprehensive magnet high school.

4. If the DISD is unable to make the necessary financial arrangements for construction while continuing the operation of the magnet schools on their present sites, interim locations will be utilized with the approval of the Court.

The sale of any magnet facilities or realty, the use of the proceeds of such sale, and any temporary or permanent relocations of

magnet schools, shall be subject to Court approval. The Court expects that the funds from any sale of magnet school facilities will be dedicated in the first instance to the construction of the comprehensive magnet high school and the balance, if any, to capital improvements required pursuant to this Judgment.

C. *Operation of the Magnet Program.*

1. The DISD shall continue the magnet programs presently in operation in the 4–6 vanguards, 7–8 academies and the 9–12 high schools, except as specified herein.

2. The DISD shall annually review the effectiveness of all magnet programs (vanguards, academies, and high schools) through evaluations conducted by its Research and Evaluation Department. From these reviews, the DISD shall determine and implement appropriate changes, subject to Court approval, to ensure that all magnet schools are effective as educational programs and as desegregation tools. These changes may include the development of new magnet options, closing of ineffective or irrelevant magnet programs, improvement of existing magnet programs, and alterations of curricula, to attract greater numbers of racially diverse students.

2. The District is authorized to reinstate the part-time magnet option for high school students, whereby students attend magnet school programs for half of each school day while taking academic subjects and participating in extra-curricular activities at their home comprehensive high schools. In small magnet schools that are not large enough to justify an academic program, the enrollment may be declared part-time only.

3. The DISD shall reduce the competitiveness between the programs in magnet schools and regular comprehensive high schools as far as feasible.

4. The DISD shall develop and implement a program to publicize the curricula at all magnet schools and the availability of free transportation to all magnets so that each student and parent in the district is made aware of these options. The school district should consider in development of this program the financial incentive, public-ity, and transportation provisions adopted for the Majority-to-Minority program.

5. The racial and ethnic percentages which shall govern enrollment at each magnet school (vanguards, academies and high schools) shall be the districtwide percentages for each group at the appropriate grade level as established in the spring of the previous year. Students may apply from anywhere in the District. Magnet school stations shall be reserved for each racial and ethnic group (anglo, black, and hispanic) according to these percentages. Students of any race or ethnicity may be permitted to fill otherwise vacant slots only after the start of classes and after all efforts to recruit and publicize the program have failed to attract additional students for the reserved slots. The District shall include in its annual April 15 report to the Court a listing of the magnet school programs which have not filled all reserved student stations; the number, ethnicity and race by school of the students who have been admitted over the reserved student slots; and the steps which the District has taken to attract students into these specific programs in order to redress the imbalanced enrollments.

6. The equivalent salary of one personnel unit will be provided sending schools for each *100* students who transfer as magnet school students. Such funds must be used for personnel, materials, or other areas designed to improve instruction.

7. Staff salaries based upon enrollment size will in no way be affected by the numbers of students transferring out of a school under the magnet school program.

8. In order to implement this Court's order regarding 9–12 magnet high schools, 7–8 academies, and 4–6 vanguards, these centers shall not be used in reporting or computing the comparability report which is required by ESEA, Title I, of the United States Department of Education, Office of Education.

9. The District shall provide free transportation for students attending vanguards, academies and magnet high schools under

the same guidelines which govern the Majority-to-Minority program pursuant to Section III hereof.

10. The DISD shall include in its April 15 report a report on the status of efforts to develop extracurricular activities at magnet high schools which are on a par with those offered at comprehensive high schools.

D. *Talented and Gifted (TAG) and Honors Programs.*

1. The DISD shall continue its efforts to ensure that Talented-and-Gifted, honors, advanced placement, high academic courses, ability grouping, and other academic programs do not become a means by which students become resegregated in classrooms, although they attend school on desegregated campuses. The DISD shall use racially neutral selection criteria for such programs; shall carefully monitor the objective and subjective selection process for such programs to insure that no student or racial group is unfairly excluded; and shall modify or eliminate any element of the selection process found to be racially discriminatory.

2. The DISD shall report to the Court in the annual April 15 report on the Talented and Gifted and all other similar programs identified in paragraph 1, indicating:

   (a) the number and percentage of students by race and ethnicity and by grade enrolled in each program for each school;

   (b) the number and percentage of classroom hours spent in these classes for each school;

   (c) the subjects which are taught in these classes and the subjects which are taught when these students return to regular classes;

   (d) the criteria which is used for entry into each program.

3. If classroom resegregation of students attending desegregated schools is caused by the operation of TAG or other similar programs for either a significant number of students or a significant proportion of school hours, the DISD will be required to meet a heavy burden to justify its continued operation of such programs. .

VI.

## REGULAR ELEMENTARY, INTERMEDIATE, MIDDLE, AND HIGH SCHOOLS

A. *K–3 Early Childhood Education Centers.* The DISD shall provide a comprehensive program of instruction in all areas based on the developmental needs of young children and the District's Baseline Curriculum Program. The K–3 approach shall be primarily diagnostic-prescriptive. The approach in the DISD Baseline Curriculum implementation shall include:

1. Small group and individualized instruction.

2. Principal and staff planning for implementing the DISD Baseline Curriculum Program in each school, in conjunction with parent advisory committees at each school site.

3. Reduction of the adult-pupil ratio from the existing district-wide ratio through tutoring, the use of parents, other adult volunteers, older students and the addition of paraprofessionals. The adult-student ratio of 1–10 shall be the goal to be achieved as rapidly as possible.

4. Continuation of a Staff Development Program consistent with the State Board of Education Plan and conducted to implement the DISD Baseline Curriculum, to meet early childhood education needs and to further the individualization of instruction. This training shall involve parents in participating roles.

5. Effective partnerships with community groups, business and other agencies which serve young children.

6. Efforts to maximize the involvement of parents in planning, reinforcing and complementing their children's learning.

7. Use of the local Early Childhood Education Center as the administrative unit which has primary responsibility for delivering quality learning experiences.

B. *4–8 Intermediate and Middle School Centers.* The DISD shall continue its pro-

gram of intermediate school centers (4–6) and middle school centers (7–8). The instructional program in these 4–6 and 7–8 centers shall follow the DISD's Baseline Curriculum. Each principal and his/her staff shall develop, in conjunction with parent advisory committees in each school, plans for the implementation of this Baseline Curriculum in the school.

C. *High Schools.* The DISD shall continue to operate the existing program in its comprehensive high schools.

D. *Bilingual Education.*

1. The DISD shall continue to provide a special instructional program for all limited-English-proficient (LEP) students in the District. In grades K–6, this program will consist of bilingual education and English-as-a-Second-Language (ESL) programs tailored to the needs of individual students and schools. In grades 7–12, this program will include ESL instruction, the High Intensity Learning Center (HILC) at Skyline High School, and the HILC now being set up at Spence Middle School. Curriculum transfers will be available to permit students in need of such programs to take advantage of them.

These special instructional programs shall include the following components:

1. Identification of potential LEP students through the PHLOTE (primary-home-language-other-than-English) survey.

2. Language proficiency assessment for students identified by the PHLOTE survey.

3. Classification of students based upon this assessment.

4. Notification to parents of LEP students of this classification and documentation of classification.

5. Student placement and instruction.

6. Reclassification and follow-up.

7. Staff development.

8. Parental involvement.

9. Continued high level of recruiting of bilingual teachers.

10. Program evaluation.

2. The DISD shall also operate the instructional program for limited-English-proficient students in accord with the mandates of all relevant Federal and State statutes, regulations and controlling case law precedents.

### VII.

### PROGRAMMATIC REMEDIES FOR PREDOMINANTLY MINORITY SCHOOLS

The goals and concepts for programmatic remedies in predominantly minority schools outlined in DISD's October 13, 1981 (Proposed) Desegregation Plan appear to be an acceptable means for redressing the vestiges of school segregation remaining in the District. The Court has determined that improvement of student achievement, especially minority student achievement, must be the priority effort for the District. The programmatic remedies outlined in the DISD October 13, 1981, proposal; the December 1, 1981, Stipulation; and in this Judgment, shall be effective commencing with the 1982–83 school year and shall continue thereafter unless otherwise ordered by the Court.

A. *Scope of Programmatic Remedies.* In its efforts to reduce and eliminate the achievement disparity between minority and Anglo students, the DISD shall:

1. Develop District-level improvement plans designed to assure that all students have the maximum opportunity to attain a level of minimal competency to be able to function adequately in today's society. The District will specifically identify the components which comprise this minimal competency.

2. Develop District-level plans to assure that each student has the opportunity to grow and develop intellectually to his or her maximum ability, particularly in the areas of reading and mathematics.

3. Develop individual School Improvement Plans that detail how each school staff will help its students reach the District-level goals. The District will help its principals develop both short and long-range improvement plans.

4. Describe in the District-level plans and the school-level plans how these plans will be monitored by the DISD for proper and effective implementation and results.

5. Establish internal evaluation procedures for review of District-wide and individual school programmatic efforts, to be monitored by a DISD employee who reports directly to the General Superintendent and whose duties include the supervision of the implementation of programmatic remedies as provided for in this Judgment. This employee shall be an individual whose experience and background reflects in-depth concentration on and sensitivity to the unique problems associated with the education of minority children.

B. *Implementation of Programmatic Remedies.* Implementation of these goals will follow the general guidelines set forth in Appendix C to this Judgment. The District shall also carefully consider the proposals for implementation of programmatic remedies contained in the Black Coalition Proposed Desegregation Plan of October 13, 1981. Programs will be implemented in all predominantly ethnic minority schools, with appropriate adaptation to the needs of individual areas and schools. The District shall commit the following resources for implementation of these programs, in addition to those resources ordinarily allocated for instructional purposes:

1. An annual allocation of fifty dollars ($50.00) per ethnic minority student in grades K–12 in predominantly ethnic minority (more than 75% minority) schools. This allocation is a supplement, or in addition, to the funds ordinarily allocated for instructional purposes. These funds shall be utilized for additional instructional materials, teacher and leadership training, and/or other programmatic improvements as developed by each subdistrict administration based on student priority needs. The needs of all ethnic minority students who are not included in this allocation will be addressed through the annual School Improvement Plans.

2. Concentration of program improvements for grades 4–6 by establishing a pupil/teacher ratio-weighted formula for every fifty (50) students functioning below the 30th percentile. For computational purposes in determining the monetary resources, one-half (½) teacher equivalent allocation will be made for each group of fifty (50) students, or a major portion thereof, in the underachievement category. *Example*:

School "A" has two hundred ninety-six (296) students in grades 4–6 functioning below the 30th percentile; the school is eligible for three teacher equivalents.

a. These additional personnel allocations/equivalents or resources may be used for additional classroom units and/or alternative instructional improvements to assist school personnel in overcoming the educational deficits of their students. When 50% of the students reach the 40th percentile in reading on nationally-normed tests, and maintain that level for at least one academic year, their school will no longer be included in the computation formula.

b. The District shall provide incentives for schools and teachers to implement programs which will help students in grades 4–6 meet the exit criteria as rapidly as possible. These incentives shall be determined by the District's administrators in conjunction with the Board of Education.

3. In order to implement the programs in predominantly minority schools, the R. L. Thornton and T. L. Marsalis Centers shall not be used in reporting or computing the comparability report which is required by ESEA, Title I, of the United States Department of Education, Office of Education.

It is anticipated that more than $6 million per year will be spent each year under the programs described in Section VII.

VIII.

NOLAN ESTES PLAZA

The District shall make the following improvements to the schools located at the Nolan Estes Plaza within two years, with the exception of the All-Sports Field House which will be completed when permanent construction funding becomes available:

A. Correct the structural and acoustical problems.

B. Develop appropriate playgrounds and facilities for sports.

C. Renovate space in the Plaza to serve as a temporary location for one or two components of the Science/Engineering and Technology School until funds for the permanent facility become available.

Such improvements shall be completed according to the timetable contained in Appendix D to this Judgment.

## IX.

### PERSONNEL

A. *Recruiting and Employment.*

1. The DISD shall develop and use recruitment and employment policies as appropriate to ensure that competent personnel are employed as teachers, and that blacks and hispanics represent, at a minimum, 43% and 12%, respectively, of all teacher positions by the 1986–87 school year. The District's recruiting and employment efforts should continue to be directed toward the goal of employment of a teacher corps which approximates the racial and ethnic composition of the District's total student enrollment.

2. In the job categories of:

(a) principals, assistant principals and deans of instruction;

(b) other certificated and professional personnel; and

(c) the top salaried administrative positions of coordinator and above; and for any future reorganization which affects these top positions;

the racial and ethnic representation shall be 40% anglo, 40% black, and 20% hispanic. No more than a 5% variance shall be permitted in the percentage representation for these positions.

3. The Court will closely monitor the District's efforts to implement paragraphs 1 and 2 above, through the annual reports and the implementation of the District's affirmative action plan (DISD Exhibit 20), and will impose further timetables if deemed necessary.

4. The DISD may rely on expanded scope of positions, lateral reassignments, promotion, and attrition to meet the above goals and timetables. If there is to be a reduction in the number of principals, teachers, teachers aides, or other staff employed by the DISD, which will result in a dismissal or demotion of any such staff member, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable nondiscriminatory standards from among all the staff of the school district. Under no circumstances will staff be terminated or promoted solely on the basis of race.

B. *Personnel Competence Assessment.* The competence of personnel shall continually be assessed in accordance with policies and procedures established by the DISD.

C. *Teacher and Principal Assignments.* Assignments for teachers and principals shall be made in accordance with *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1970), by plus or minus 2.5%. *See Tasby v. Estes*, 517 F.2d 92, 107 (5th Cir. 1975). However, if the needs of a given school *clearly* demonstrate that deviations from the above requirements are necessary in order to staff and administer the programs in predominantly minority schools, or such programs as special, vocational, and bilingual education in any school, the DISD shall have the discretion to assign minority teachers to these schools at variance with the respective percentages established by *Singleton.* Any assignments pursuant to the previous sentence must comply with the guidelines of the Emergency School Aid Act and the District's agreement with the Office for Civil Rights regarding permissible variation from *Singleton* requirements. In no instance, however, will minority teachers be assigned to schools merely because the student enrollment is predominantly minority.

D. *Training.* In-depth training of teachers, principals and administrators shall be provided as needed to implement this plan. Attendance shall be required.

## X.

### FACILITIES

The DISD shall not construct, make any additions or major renovations, purchase, lease, sell, close, open, acquire or dispose of any school, building or other realty without prior approval of the Court. Any such plans will be evaluated in light of the impact which these undertakings will have upon the disestablishment of the dual school system. Only those projects which will either foster the desegregation process, or will not affect it at all, will be approved and only after full hearing and entry of an order. *See Tasby v. Estes*, 517 F.2d 92, 110 (5th Cir.), *cert. denied*, 423 U.S. 939 (1975).

## XI.

### REPORTING AND MONITORING

A. *DISD Reports.* The DISD shall file a report with the Court on December 15 and April 15 of each year which contains the following information:

1. The number and percentage of students by race and ethnicity and by grade for each school and campus, including vanguards, academies, and magnets. The data should be presented by the standard grade levels—K–3, 4–6, 7–8, and 9–12—and alphabetized by school. (*See* Appendix D to DISD Proposed Desegregation Plan of October 13, 1981.)

2. The total enrollment and percentage of students by race and ethnicity, and grade level for

a. K–3 schools

b. 4–6 schools

c. 7–8 schools

d. 9–12 schools

e. vanguards, academies and magnet high schools (reported separately and with full and part-time students identified separately)

f. each Subdistrict; and

g. all DISD schools.

3. A listing of the numbers and names of predominantly one race and naturally desegregated schools and campuses, subdivided by subdistrict and by racial group. (*See* Cunningham Exhibit 31.)

4. The number and percentage of students by race, ethnicity, grade level and subdistrict who are being transported:

a. for desegregation purposes in 4–6 and 7–8 grades;

b. to vanguards, academies and magnet high schools (figures should be for those actually transported);

c. in the Majority-to-Minority program, identifying numbers transported on DISD routes, on public transportation, and for extracurricular activities after school hours;

d. to their neighborhood school under the two-mile program.

5. Data on the Majority-to-Minority transfer program including:

a. the number and percentage of students by race, ethnicity and grade level, by sending and receiving school;

b. total participation by race, ethnicity and grade level for each subdistrict and for DISD as a whole;

c. report on results of annual review of eligibility criteria pursuant to Section III(A)(6) herein and recommendations, if any, for changes in the criteria;

d. the number and percentage of students by race, ethnicity and grade level who have been provided tuition credits pursuant to Section III(B)(3) with total figures for each year since entry of this Judgment;

e. copies of the M–M brochure for the relevant school year; and examples of a supplement and the direct-mail letter to parents required pursuant to Sections III(D)(1) and (5).

6. The total number and percentage of students by race, ethnicity and grade level who received curriculum transfers pursuant to Section IV herein.

7. A report on the status of the Magnet Schools program which addresses:

a. the implementation of the Engineering/Science clusters at the Nolan

Estes Plaza and the TAG program at L. G. Pinkston High School;

b. the construction of a new magnet facility pursuant to Section V(B)(2);

c. the centralization of magnet programs pursuant to Section V(B)(3);

d. the program to publicize the magnet schools and the availability of free transportation pursuant to Section V(C)(4);

e. (April 15 report) the conclusions of the annual review of magnet schools pursuant to Section V(C)(1) and whether any changes are recommended; and

f. the data on magnet school programs which have not filled all reserved student stations pursuant to Section V(C)(5).

8. (April 15 report) A report on the eligibility criteria and participation in Talented-and-Gifted and other similar programs pursuant to Sections V(D)(2) and (3).

9. (December 15 report) A report on the number and percentage of students by race, ethnicity and/or primary language and by grade level who are receiving instruction in the limited-English-proficient program.

10. A report on the implementation of the programmatic remedies which includes:

a. the longitudinal achievement trends in DISD including both quasi and cohort longitudinal trends. (December 15 report);

b. a listing of schools which are receiving the allocation pursuant to Section VII(B)(1) and the total amount received by each school and subdistrict;

c. a listing of each school and the number and percentage of students by race and ethnicity at each school which receives additional resources allocated for 4–6 schools pursuant to Section VII(B)(2) and the total resources received by each school;

d. a report by the 1986–87 school year on longitudinal achievement trends in predominantly minority schools receiving the allocation pursuant to Section VII(B)(1).

11. A report on the status of completion of improvements to the Nolan Estes Plaza pursuant to Section VIII.

12. A report on the selection and assignment of personnel including:

a. the total number and percentage of teachers (including bilingual, vocational and special education teachers), principals, certificated personnel, administrators, and those technical personnel not included in these categories (reported separately) by race and ethnicity;

b. the full-time assignments for teachers (including bilingual, special education and vocational), principals and certificated personnel by school and subdistrict (including vanguards, academies and magnets) and by race and ethnicity;

c. the number and percentage of teachers by race and ethnicity and subdistrict where assignments have been made pursuant to Section IX; and the programmatic justification for the assignment;

d. the progress toward meeting the employment goals for teachers, principals, certificated personnel, and administrators pursuant to Sections IX(1) and (2) including:

(1) the number of positions as teachers, principals, certificated personnel and administrators which have become available and have been filled since 1976 by race and ethnicity. The four categories of positions are to be reported separately;

(2) the number and percentages of applicants by race and ethnicity and by year for positions in these four categories, which either are presently available or become available after entry of this Judgment; and

(3) the number and percentages of positions in these categories by race and ethnicity who are laid off or reassigned due to budget cutbacks.

13. A report on the funds which have been allocated and expended to implement the provisions of this Judgment, subdivided by specific category and by year.

B. *External Audit.* The Court shall appoint an external auditor who shall report annually on June 15 on the District's desegregation efforts. The report shall include a comprehensive evaluation and any recommendations for improvements in the following areas:

1. the implementation by DISD of the financial incentive, publicity and transportation provisions of the Majority-to-Minority transfer option, and whether these provisions have been successful in increasing M–M transfers;

2. the operation of the magnet school program by DISD including

   a. the development of and implementation of new magnet high school programs at Nolan Estes Plaza and L. G. Pinkston;

   b. the effectiveness of the vanguards, academies, and magnet high schools as desegregation tools;

   c. the implementation and success of the publicity and transportation program;

   d. an evaluation of the vanguards, academies and magnet high schools which have failed to fill reserved student stations and the steps which DISD has taken to attract students into these programs.

3. the operation of the Talented and Gifted and other similar honors programs and whether the entry criteria or conduct of such classes is causing resegregation of students;

4. the operation of the instructional program for limited-English-proficient students;

5. the implementation and results of the programmatic remedies including

   a. the degree to which the compensatory education programs have been incorporated into predominantly minority schools;

   b. the resources which have been committed to the programs in predominantly minority schools and in 4–6 schools; how these funds have been expended; and the effect of these programs on achievement trends in both areas;

c. the development and adequacy of internal evaluation procedures for review of programmatic efforts.

6. the completion of the structural and other improvements to the Nolan Estes Plaza;

7. the DISD actions to meet the affirmative action goals set for recruitment and employment of teachers, principals, certificated personnel and administrators and whether the assignment of teachers comports with the provisions of this Judgment.

8. the condition of facilities;

9. resource allocation in terms of textbooks, libraries, supplies, etc.

The external auditor should utilize the information supplied in the DISD April 15 and December 15 reports to the Court in the preparation of its evaluation. The external auditor may use any appropriate method to develop the information required by this Judgment, including random samples of school facilities and programs.

The Court shall retain the Educational Testing Service as the external auditor for the remainder of the 1981–82 school year. For any subsequent period, however, the Court plans to reexamine the appointment and may call upon all counsel for recommendations of other possible candidates.

The results of this external educational audit shall be publicized in the DISD newsletter and the complete audit shall be made available to the public and to all parents or guardians of students in the DISD. Any party to this suit who wishes to make comments or be heard regarding the content of the internal accountability reports or the external educational audit may file such comments or motion within thirty days after the filing of the external educational auditor's report on June 15.

C. *Tri-Ethnic Committee.* The Tri-Ethnic Committee shall continue for the present time to operate under the mandate set out in the Court's 1971 Order. The Court directs the Black Coalition to Maximize Education to prepare a report by April 15, 1982,

with specific recommendations on the role, if any, which the Tri-Ethnic Committee should play in the monitoring of the implementation of the provisions of this Judgment. Any party to this suit who wishes to make any comments regarding the role, if any, of the Tri-Ethnic Committee or the Black Coalition's recommendations, shall file such comments by *May 10, 1982.*

## XII.

### OTHER PROVISIONS

A. *Retention of Jurisdiction.* The Court will retain jurisdiction of this case to assure the implementation of the required desegregative actions and to enforce the provisions of this Judgment.

B. *Final Judgment.* This Judgment shall be considered final for purposes of appeal.

### ON MOTION FOR NEW TRIAL OR RECONSIDERATION

This case is before the Court on the Motion for New Trial or Reconsideration of Judgment filed February 11, 1982, by Defendant Dallas Independent School District ("DISD"). For the reasons set forth below the Court is of the opinion that the motion should be denied.

Initially, DISD complains that the Court has imposed "racial hiring quotas upon the District". Several points need to be made about this allegation.

First, there is nothing novel about the provisions of the Court's Judgment setting forth hiring goals; similar provisions were included in the 1976 Judgment and DISD had no objection to such provisions then.

Second, DISD's allegation that the Court has imposed "racial hiring quotas" is simply not true. The February 1st Judgment sets forth goals for minority hiring, not quotas. Nowhere in the Judgment or the two page Order accompanying it did the Court use the term quotas, or otherwise indicate that the goals it established were rigid or inflexible. DISD's construction of the Judgment ignores the express language of Section IX of the Judgment and the February 1st Order. That Order, which discussed the hiring provisions of the Judgment, used the word "goals" at least nine times. To put it plainly, the allegation that the Court has imposed "racial hiring quotas" is a clear misstatement of the Court's position.

The Court used strong language to describe the DISD's obligations because it strongly believes that the goals can and should be met. That is not to say that they must be met at any expense; it is simply to advise DISD that the Court expects a determined and good faith effort by DISD to meet the goals. The Court has not prescribed any standards of qualifications or competency for teacher hiring—that is the task of the school district. The Court does expect, however, that DISD will apply its standards impartially, objectively and without regard to race or ethnicity. Certainly, no racial or ethnic group has a monopoly on competency or qualifications.

The Court believes that with aggressive efforts the District can locate additional hispanics and blacks who are just as competent and just as qualified as anglos to teach in the Dallas schools. If, however, for reasons beyond its control, the DISD is unable to meet the hiring goals, the Court will consider modifications upon appropriate motion and hearing, with all parties to this litigation afforded the opportunity to participate.

The other principal ground asserted by DISD for reconsideration relates to the Court's restructuring of certain high school attendance zones. Several points need to be made about this complaint, also.

The attendance zone changes which the Court has ordered affect substantially less than 1% of the 128,000 students in the Dallas school system. No student now enrolled in a high school is required to transfer to another high school by reason of these attendance zone changes. The feasibility of these changes is not in dispute; indeed, prior to ordering them, the Court personally ascertained that the transportation time between the affected schools is considerably less than the 30 minute transportation time limit set in the Court's August 3 Opinion,

**154**

and, in most instances, does not exceed 15 minutes.

The controlling rule of law and the succinct response to the DISD complaint about attendance zone changes was announced by Chief Justice Burger for a unanimous Supreme Court many years ago: every previously segregated school system must "make every effort to achieve the greatest possible degree of actual desegregation." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). This principle has been repeatedly affirmed in hundreds of decisions; it has never been diluted or modified by the U. S. Supreme Court or by the Fifth Circuit. *See, e.g., Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (*Dayton II*); *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Lemon v. Bossier Parish School Board*, 566 F.2d 985 (5th Cir. 1978); *U. S. v. DeSoto Parish School Board*, 574 F.2d 804 (5th Cir.), *cert. denied*, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978); *U. S. v. Texas Education Agency (Lubbock I. S. D.)*, 600 F.2d 518 (5th Cir. 1979); *Lee v. Macon County*, 616 F.2d 805 (5th Cir. 1980); *Valley v. Rapides Parish School Board*, 646 F.2d 925, 942 (5th Cir. 1981). It is this rule of law which obligates this Court to order attendance zone changes which will feasibly further desegregation.

The remainder of DISD's reconsideration motion relates to the Court's refusal to adopt the so-called Minority Neighborhood Option Plan, and the Court's finding in the August 3, 1981, Opinion that vestiges of racial segregation remain within the Dallas school district. The reasons for the Court's rulings on these matters are sufficiently set forth in the Court's previous opinions; in its motion, DISD advances no arguments which the Court has not previously considered and rejected.

The Court is of the opinion that DISD's Motion for New Trial or Reconsideration of

Judgment is wholly without merit and it is, therefore, in all respects DENIED.

SO ORDERED.